[No. S004698. Crim. No. 24738. June 14, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD RAYMOND RAMIREZ, Defendant and Appellant.

**COUNSEL**

Barry L. Morris, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Jay M. Bloom and William M. Wood, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BROUSSARD, J.**—Defendant Richard Raymond Ramirez appeals from a judgment of death imposed under the 1978 death penalty law. (Pen. Code, § 190.1 et seq.)[1] At the initial phase of the trial proceedings, the jury found defendant guilty of first degree murder (§ 189), rape (§ 261), and sodomy (§ 286), and also found true two special circumstances, a rape-murder special circumstance (§ 190.2, subd. (a)(17)(iii)) and a sodomy-murder special circumstance (§ 190.2, subd. (a)(17)(iv)). At the first penalty phase trial, the jury was unable to reach a unanimous verdict and a mistrial was declared. At the second penalty phase trial, the jury returned a sentence of death, and the trial court denied defendant's application to modify the verdict and entered judgment in accordance with the jury's verdict. This appeal is automatic. (§ 1239, subd. (b).)

## I. FACTS

### A. GUILT AND SPECIAL CIRCUMSTANCE PHASE

#### (1) *Prosecution Case*

Shortly before 6 a.m. on Monday, November 21, 1983, a local resident discovered the body of Kimberly Gonzalez (Kim) in a narrow walkway located a short distance from the rear parking lot of a bar, Mr. Barry's, in the City of Garden Grove in Orange County. When the body was found, the victim's pants were pulled down around her ankles and her panties were pulled down to her knees; subsequent medical tests found traces of semen in the victim's vaginal and anal areas. A total of 19 stab wounds were found on the victim's hands, forearm, forehead, chin, shoulders and neck; a pathologist testified that a wound to the back of Kim's neck, which severed her spinal cord, was the probable cause of death.

Much of the evidence concerning the events preceding Kim's death was not in dispute. Kim, who was 22 years old at the time of her death, worked as a teller for Bank of America and lived in the City of Norwalk in Los

---

[1] Unless otherwise indicated, all section references are to the Penal Code.

Angeles County with her sister Yvette and Yvette's family. She had relatives who lived in Orange County, however, and she and her good friend, Ramona Sanchez, often went to two bars in Orange County to socialize. Ramona testified that on Saturdays the two often went to a bar named Smitty's, and that on Sundays they usually went to Mr. Barry's; Ramona said that she and Kim went to these places because both bars had dancing, she and Kim knew the regular customers at each locale and they had never had any problems at either place.

On November 19, 1983, the Saturday before her death, Kim mentioned to Ramona that she (Kim) wanted to go to Mr. Barry's on Sunday evening. Ramona told Kim that she already had other plans and could not go with her. Although Ramona testified that she had never known Kim to go to a bar by herself, on this occasion Kim decided to go alone.

On Sunday evening, November 20, Kim borrowed her father's truck from another sister, Paulette, and arrived at Mr. Barry's between 8 and 9 p.m. She parked the truck in a well-lit parking lot in front of a donut shop located in the same shopping center as Mr. Barry's; Ramona testified that she and Kim never parked in the lot behind Mr. Barry's because it was too dark. On her arrival at Mr. Barry's, Kim talked to Pauleno Aldano, a regular customer, who bought Kim a drink; Kim then talked to Phil Palomino, the bar's bouncer, and played a game of pool with him.

In the early part of that same evening, defendant spent a few hours with a small group of friends and relatives at a bar known as My Place. At around 10 or 11 p.m., the group left My Place and went to Mr. Barry's. Defendant drove in his own car, which he parked in the front parking area of Mr. Barry's. On his arrival, defendant's brother Daniel bought defendant a beer——a Budweiser, served in a long-necked bar bottle.

A number of witnesses testified that Daniel and defendant had met Kim and Ramona at Mr. Barry's a week or two before November 20. On that earlier occasion, Kim and Ramona had been playing pool when Daniel and defendant approached them, struck up a brief conversation and then left shortly thereafter. On November 20, Kim and defendant met again at Mr. Barry's, and a number of patrons observed the two talking, drinking, dancing and briefly kissing in the bar. Several witnesses testified that Kim had quite a bit to drink during the evening, although there was a dispute in the evidence over whether she had been "cut off" from additional drinks or had just been cautioned by a bouncer.

By 1 a.m., a number of patrons had left Mr. Barry's but defendant and Kim were still together in the bar, sitting at a table near the jukebox that

was close to the rear door. Shortly after 1 a.m., defendant and Kim left the bar by the rear door, which led to a rear parking lot. As he was leaving, defendant was seen carrying a long-necked bottle of Budweiser beer. Neither defendant nor Kim returned to the bar.

One end of the walkway in which Kim's body was found the next morning is located across from the rear parking area of Mr. Barry's. The remaining patrons in Mr. Barry's left the bar when it closed at 2 a.m. By that time, defendant's car—which had been parked in front of Mr. Barry's—was gone. The bartender testified that she did not notice anything unusual when she left by the rear door about 2:20 or 2:30 a.m.

There were no eyewitnesses to the crime, but from the location of the stab wounds on Kim's hands and the displaced shrubbery in the vicinity of the body, the prosecution theorized that Kim had attempted to defend herself from her knife-wielding assailant but had been overpowered, thrown to the ground, raped, sodomized and then killed through repeated stabbings. An employee of the coroner's office estimated the time of death as 3 a.m., plus or minus one or perhaps two hours; laboratory tests placed Kim's blood-alcohol level at the time of death at approximately .17 percent.

According to the prosecution, aside from the act that defendant was the last person seen with Kim as they left the bar's rear door, the key piece of evidence tying defendant to the killing was a long-necked Budweiser beer bottle, with defendant's fingerprints, found by the police in the walkway, about 30 feet from Kim's body. The expert witness who examined the bottle testified that she was able to positively identify two of the ten fingerprints found on the bottle as defendant's, and that the remaining prints were consistent with defendant's fingerprints but were not clear enough to identify positively; she also testified that none of the prints found on the bottle matched the fingerprints of the victim.

The prosecution also presented several expert witnesses who testified (1) that defendant, a "non-secreter," fell within the 60 percent of the male population who could have produced the semen found on the victim, and (2) that the poncho which defendant wore on the night of the killing contained several small spots that appeared to be blood, but could not be identified as of a particular blood type or even as human blood. On cross-examination, the witnesses acknowledged that no pubic hairs consistent with defendant's pubic hairs were found on the victim, no fibers from defendant's clothes were found under the victim's fingernails or on her clothing, and that no evidence of blood was found in defendant's car.

## (2) *Defense Case*

Defendant testified in his own defense and, with respect to the preliminary events, gave a similar account to that described by the prosecution witnesses. He acknowledged that on the night in question he went to Mr. Barry's with a group of relatives and friends. He testified that sometime after he arrived at the bar, Kim approached him and asked if he wanted to dance; he stated that she seemed to be a little high at that time. They danced for a few minutes, talked for a while, and then danced again for several minutes; while they were dancing the second time, he kissed her. They sat down at a table and talked and kissed a few more times. He stated that at one point he had tried to give Kim some money to buy a drink for her, but she told him that she had been cut off by one of the bouncers and that he would have to get it for her. He estimated that the two sat together at a table in the rear of the bar for forty-five minutes to an hour.

Defendant testified that about 10 minutes before he left the bar he told Kim that he would soon be leaving, and that she offered to walk him out. According to defendant, they went out the back door rather than the front because, after he turned around to tell his sister he was leaving, Kim was already heading out the back door and he simply followed her; he stated that, as far as he was concerned, when they left the bar he was not interested in pursuing any further sexual activity with Kim.

Defendant testified that when they got outside they kissed again briefly and then walked around the building to his car in the front parking lot of the bar. Defendant stated that he was carrying a bottle of beer at the time, and that he was feeling "kind of drunk" when he got to his car and gave the bottle, which was still about half full, to Kim. He said when he last saw Kim she was walking back towards the front door of the bar. He denied entering the walkway in which Kim's body was found and denied sexually assaulting or killing Kim.

Defendant testified that he drove directly from Mr. Barry's to the home of his girlfriend, Norma Avila, who was pregnant with his baby. Defendant stated that he arrived at Norma's home at 1:30 a.m. and went to sleep. Defendant testified that when he learned a few days later that the police were looking for him, he voluntarily went to the police station, where he was arrested.

Defendant's girlfriend testified in his behalf and confirmed that he had arrived at her house at 1:30 a.m. on the night in question. She stated that there was nothing unusual about his conduct or demeanor when he arrived

at her home that night and indicated that they just talked for a few minutes and then went to sleep.

The defense also presented evidence to show that Kim could have been killed by someone else. Both prosecution and defense witnesses testified that the area in which the bar was located was a high crime area and that the alley where the killing occurred was dark and particularly dangerous at night. The evidence also revealed that another bar, whose patrons were characterized as "low rider" types, also had a rear door that opened onto the alley in question. In addition, the defense presented a few witnesses who testified that, about a month prior to the killing, a former boyfriend of Kim had made some threats to her.

(3) *Verdict*

After more than three days of deliberations, the jury returned its verdict, finding defendant guilty of first degree murder, rape, and sodomy and finding that he had used a deadly weapon in the commission of all three offenses. The jury also found true two special circumstances: that defendant had committed the murder during the commission, or attempted commission, of rape and of sodomy.

B. PENALTY PHASE

At defendant's first penalty phase trial, the jury was unable to unanimously agree on penalty and the court declared a mistrial.

(1) *Prosecution Case*

At the second penalty trial, the prosecution presented a number of witnesses who had testified at the initial guilt phase to establish the circumstances of the offense. One of the patrons who had been at Mr. Barry's on the night in question testified with regard to the events within the bar, and several police investigators and the pathologist who performed the autopsy described the condition of the body and the scene of the crime, and identified defendant's fingerprints as those found on the beer bottle that was discovered in the walkway a short distance from Kim's body.

The prosecution also introduced defendant's stipulation to three prior felony convictions: a 1978 conviction for forcible rape (former § 261, subd. 2), a 1978 conviction for illegal possession of a concealed weapon (§ 12020), and a 1980 conviction for receiving stolen property (§ 496, subd. 1). In addition to the stipulation, the prosecution presented witnesses who testified to the facts surrounding two of the prior felony convictions.

The rape victim, Sandy F., testified that she had met defendant very casually on two occasions a few days prior to the rape, once when she was standing in the front yard of her apartment building and once when defendant came to the door of her apartment to borrow cigarettes for his girlfriend. On the night she was raped, defendant entered her house with a butcher knife while she was asleep on her couch; when she awoke, defendant was on top of her and was holding the knife to her throat and one hand over her mouth. Defendant repeatedly threatened to kill her and her one-year-old son who was asleep in the adjoining room—or to cut off her son's legs—if she did not engage in intercourse with him. Defendant compelled her to take off her nightgown and forcibly raped her several times. During the course of the attack, defendant took her into the bathroom and inserted a hair spray can into her vagina, causing her considerable pain. She begged him to stop, but he refused. When defendant entered her son's room, she ran out of the apartment screaming, and defendant fled. As a result of the attack, she suffered a torn uterus and, after four unsuccessful operations, had to have a hysterectomy. She was 23 years old.

Two witnesses testified to the facts surrounding defendant's conviction of illegally possessing a concealed weapon. Defendant committed the offense while confined at the Preston School, a California Youth Authority facility, after his conviction for the rape described above. A registered nurse who worked in the school's infirmary testified that on one occasion when defendant came to the clinic for treatment for nosebleeds, he was given ointment to put on his nose; after applying the ointment, defendant lowered his arm. When he did so, the nurse heard the noise of a falling object. As she turned around to face defendant, she saw a knife—an eight-and-one-half-inch table knife that had been sharpened to a point—on the floor next to him. Defendant then picked up the knife and, without making any threatening remarks or gestures, handed the knife to another nurse. The other nurse who was present at the time corroborated this testimony.

### (2) *Defense Case*

The defense presented a variety of witnesses on defendant's behalf. A man who was not acquainted with defendant but who had seen him at Mr. Barry's on the evening of November 20, 1983, testified that, in his opinion, defendant appeared to be either intoxicated or on drugs that night; the witness had not spoken to defendant, but based his opinion on defendant's agitated conduct at the bar's pool table. A police officer testified that defendant had come to the police station voluntarily on November 23, 1983, after learning that the police were looking for him.

Defendant's mother recounted some of the facts of defendant's troubled childhood—his father's alcoholism, several serious illnesses that defendant

experienced, the family's economic hardships, his parents' divorce—and the effect that his father's death, when defendant was a teenager, had had on him.

A number of psychologists testified that defendant had an IQ—variously rated at between 68 and 84—that placed him in the "dull normal" range with severe learning disabilities, and that although defendant's learning problems were identified early in his schooling, the educational system had totally failed him, in part because the classes for educationally handicapped students in his elementary school were already full. Another psychologist who specialized in the treatment of sex offenders testified that the California Youth Authority facility at which defendant had been confined after his prior rape conviction had no treatment for sex offenders, and suggested that if treatment had been available in 1978, there was a strong possibility that defendant may have been aided in controlling his abnormal sexual behavior. On cross-examination, the psychologist stated that from the testing he had recently performed on defendant, he had concluded that defendant suffers from sexual psychopathology and is predisposed to the commission of harmful sex acts.

A retired prison chaplain testified to the positive changes he had seen in some of the death row inmates who had been confined in prison for many years, describing them as becoming more mature and insightful through prison study. A firefighter who supervised a fire crew on which defendant had worked while in the county jail testified that defendant was chosen for the crew because of his good conduct in jail and that his behavior while performing firefighting duties was exemplary. A deputy sheriff at the county jail confirmed defendant's good conduct at the jail.

Finally, a neurologist and a professor of psychiatry involved in brain research testified that defendant's EEG results indicated that there was something abnormal in defendant's brain activity, though neither could predict how the abnormality might have affected specific behavior.

(3) *Verdict*

After one day of deliberation, the jury returned a verdict of death. Thereafter, the trial court denied defendant's motion to modify the judgment and entered a judgment of death.

The case is before us on an automatic appeal. (§ 1239, subd. (b).)

## II. GUILT PHASE ISSUES

### A. JUROR MISCONDUCT

Soon after the prosecution began presenting its case-in-chief, the trial judge, in a bench conference with counsel, expressed concern with the in-court behavior of one of the jurors, Juror Townsend. The judge noted that the juror "was leaning forward, holding her head in her hands. Her eyes look strange and the way she's walking out of this courtroom. I'm concerned whether or not she's actually taking drugs and so forth." The judge also reported that Townsend's doctor had called to inform the court that the doctor had received a telephone call from Townsend in which she had stated that she was hysterical and did not feel that she could sit on the case because of her own experience of being mugged at gunpoint.[2]

At this same time, the prosecutor told the court that two witnesses who had already testified for the prosecution had informed him that Townsend had made a brief comment to them in the hallway, telling them that "I thought you guys did a great job. If I had been up on the witness stand, I would have probably broke down crying."

The trial court called Townsend in and asked her to explain the situation. She stated that she had become very upset and had "a major headache" and a stomachache. She also admitted making the comment to the two witnesses, stating that "I told them they took it pretty well, because I would have broke down and cried." At the court's insistence, Townsend agreed to see her doctor that evening, and the court indicated it would go into the matter of whether she should remain on the jury the next day.

The following morning, the court received a note from Townsend's doctor indicating that Townsend was having an "acute anxiety reaction" and recommending that she be excused. The court called Townsend in again, and when it appeared that her condition would affect the performance of her duties, the court excused her from the jury over defense counsel's objection and replaced her with one of the alternate jurors.

On appeal, defendant does not argue that it was improper for the court to excuse Townsend. Under former section 1123 (now Code Civ. Proc., § 233), the court was authorized to excuse a juror who "becomes sick or . . . is found to be unable to perform his or her duty," and defendant apparently

---

[2] Townsend had revealed the mugging on voir dire, but had indicated at that time that she did not think it would affect her performance as a juror.

acknowledges that the court could properly find from its questioning of Townsend that she fell within this category.

■ Defendant contends, however, that the trial court erred in failing to inquire whether *other jurors* were improperly affected by Townsend's misconduct, relying on the observation in *People* v. *McNeal* (1979) 90 Cal.App.3d 830, 839 [153 Cal.Rptr. 706], that "[o]nce a court is put on notice of the possibility that improper or external influences are being brought to bear on a juror, it is the court's duty to make whatever inquiry is reasonably necessary to determine if the juror should be discharged *and whether the impartiality of other jurors had been affected.*" (Defendant's italics.) (See also *People* v. *Burgener* (1986) 41 Cal.3d 505, 519-520 [224 Cal.Rptr. 112, 714 P.2d 1251].)

As the Attorney General points out, however, there is absolutely no indication in the record that other jurors may have been affected by Townsend's "anxiety attack" or misconduct. As far as Townsend's peculiar in-court behavior is concerned, the trial court specifically explained to the other jurors that Townsend was being excused because she "has not been feeling well"; there is no reason to suspect that her conduct—holding her head in her hands and appearing not to be paying attention—may have affected the impartiality of other jurors. And although Townsend's out-of-court comment to the two witnesses was clearly misconduct, there is nothing in the record to suggest either that any other juror was aware that Townsend had made the remark or that the remark, even if overheard, could have affected any juror's impartiality. The two witnesses to whom Townsend spoke were minor witnesses who knew the victim but who testified to uncontroverted matters.

Under the circumstances, we conclude that there was not a sufficient possibility of an improper effect on other jurors to trigger a duty on the part of the court to extend its inquiry beyond Juror Townsend.

B. SUFFICIENCY OF EVIDENCE OF SODOMY

■ Defendant does not contend that the evidence is insufficient to support the first degree murder or rape convictions or the rape-murder special circumstance, but he does contend that there is insufficient evidence to support the sodomy conviction or the sodomy-murder special circumstance. Although defendant acknowledges that the pathologist called by the prosecution testified (1) that when he examined the victim's body with an ultraviolet light during the autopsy, he noticed fluorescence, indicating the possible presence of semen, in the vaginal and anal areas, (2) that seminal fluid was subsequently found in the anal area, and (3) that the victim's anus was

dilated, indicating that "at or about the time of death, penetration had been made into the anus," defendant contends that this evidence is not sufficient to support a sodomy conviction, or a sodomy-murder special circumstance, because it does not adequately prove that the victim was alive at the time of the penetration.

Section 286 provides that "[s]odomy is sexual conduct consisting of contact between the penis of one person and the anus of another person," and section 287 provides that "[a]ny sexual penetration, however slight, is sufficient to complete the crime of sodomy." (See *People* v. *Martinez* (1986) 188 Cal.App.3d 19, 24-25 [232 Cal.Rptr. 736].) Although we have found no case that discusses the question of whether the offense of sodomy requires that the victim be alive at the time of penetration, with respect to the analogous crime of rape the California authorities uniformly hold that the victim "must be alive at the moment of penetration in order to support a conviction of rape . . . ." (*People* v. *Stanworth* (1974) 11 Cal.3d 588, 604, fn. 15 [114 Cal.Rptr. 250, 522 P.2d 1058]; *People* v. *Sellers* (1988) 203 Cal.App.3d 1042, 1050 [250 Cal.Rptr. 345].) The People do not suggest that the same requirement does not apply to sodomy. Because the sodomy statute, like the rape statute (§ 261), defines the crime as sexual contact with another "person" rather than with a "body," we conclude that the offense of sodomy requires that the victim be alive at the time of penetration.[3]

Nonetheless, we cannot agree with defendant's contention that the evidence presented in this case was insufficient to support a sodomy conviction. Although the prosecution's pathologist may not have been able to determine clinically whether penetration occurred shortly prior to death, at death, or just after death, in the absence of any evidence suggesting that the victim's assailant intended to have sexual conduct with a corpse (cf. *People* v. *Sellers, supra,* 203 Cal.App.3d at pp. 1049-1050), we believe that the jury could reasonably have inferred from the evidence that the assailant engaged in sexual conduct with the victim while she was still alive rather than after she was already dead. Under the applicable standard of review (see *People* v. *Johnson* (1980) 26 Cal.3d 557, 576-578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; *Jackson* v. *Virginia* (1979) 443 U.S. 307, 318-319 [61 L.Ed.2d 560, 573-574, 99 S.Ct. 2781]), we conclude that a reasonable trier of fact could have found the essential elements of sodomy beyond a

---

[3] The Model Penal Code's sodomy provision—"deviate sexual activity by force or imposition"—applies only to sexual conduct with a live person. (See Model Pen. Code & Commentaries, com. 1 to § 213.2, p. 360.) Sexual conduct with a dead body is covered by a separate provision directed at abuse of a corpse. (See *id.,* com. 2 to § 250.10, p. 421.) California has a comparable statute punishing mutilation of a dead body. (See Health & Saf. Code, § 7052.)

reasonable doubt. (Cf. *People* v. *Morales* (1989) 48 Cal.3d 527, 552-553 [257 Cal.Rptr. 64, 770 P.2d 244].)[4]

Accordingly, we reject the defendant's claim that the evidence is insufficient to support the sodomy conviction or the sodomy-murder special circumstance.[5]

## C. Instructions on Required Mental State

In accord with the general CALJIC instructions, the trial court instructed the jury that rape and sodomy are general intent crimes, but that rape-felony-murder requires a finding that defendant had the specific intent to commit rape.[6] Although defendant does not contend that the instructions erroneously stated the applicable legal principles, he maintains that the combination of general and specific intent elements could only have been confusing to the jury, requiring "proof of contradictory mental states." The Attorney General responds that the instructions were not misleading

---

[4] Although the trial court did not expressly instruct the jury that sodomy required penetration of a live person, the court did instruct the jury that the offense required contact between the penis of one person and the anus of "another person," and defendant does not contend that the trial court had a sua sponte duty to specifically instruct the jury of the requirement that the victim be alive at the time of penetration. As noted, defendant did not raise this issue at trial, and, under the circumstances, the issue cannot be said to be one which was so "closely and openly connected with the facts before the court" as to require a sua sponte instruction. (See, e.g., *People* v. *Wade* (1959) 53 Cal.2d 322, 334-335 [1 Cal.Rptr. 683, 348 P.2d 116]; cf., e.g., *People* v. *Sellers, supra*, 203 Cal.App.3d at p. 1051.)

[5] In light of our conclusion that the evidence is sufficient to support the sodomy conviction, we have no occasion to address the People's alternative argument that even if the evidence is insufficient to support the sodomy conviction, the evidence is nonetheless sufficient to support the sodomy-murder special circumstance, because the special circumstance can be established by proof that the murder occurred while defendant was engaged in the commission of, *or the attempted commission of,* sodomy. (§ 190.2, subd. (a)(17)(iv).) The People argue in this regard that even if the evidence is not sufficient to show that defendant achieved penetration while the victim was still alive, the jury could have found that the murder was committed while defendant was engaged in an attempted sodomy. (Cf., e.g., *People* v. *Goodridge* (1969) 70 Cal.2d 824, 838 [76 Cal.Rptr. 421, 452 P.2d 637].)

[6] The general intent instruction on rape and sodomy, which was based on CALJIC No. 3.30 (4th ed. 1979 bound vol.), read in full: "In the crimes charged in Counts I and II of the information, namely, rape and sodomy, there must exist a union or joint operation of act or conduct and general criminal intent. To constitute general criminal intent it is not necessary that there should exist an intent to violate the law. When a person intentionally does that which the law declares to be a crime, he is acting with general criminal intent, even though he may not know that his act or conduct is unlawful."

The specific intent instruction on rape-felony-murder, which was based on CALJIC No. 8.21 (4th ed. 1979), read: "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs as a result of the commission of or attempt to commit the crime of rape, and where there was in the mind of the perpetrator the specific intent to commit such crime, is murder of the first degree. [¶] The specific intent to commit rape and the commission or attempt to commit such crime must be proved beyond a reasonable doubt."

and did not require proof of contradictory mental states, but rather accurately set forth the different elements of the separate crimes with which defendant was charged.

The Attorney General's position is well taken. The instructions did not require proof of contradictory mental states. Under the instructions, if the jury found that defendant did not act with the specific intent to rape, it could have found him guilty of rape but not of rape-felony-murder. If the jury found that defendant did act with the specific intent to rape, it could have found him guilty of both rape and rape-felony-murder. There was no inconsistency in the instructions. (See, e.g., *People* v. *Northrop* (1982) 132 Cal.App.3d 1027, 1038 [182 Cal.Rptr. 197].)

### D. FAILURE TO INSTRUCT ON INTOXICATION AND SPECIFIC INTENT

■ Defendant next contends that the trial court erred in failing to instruct the jury, pursuant to CALJIC No. 4.21, that if it found that defendant was intoxicated at the time of the offense, it could consider such voluntary intoxication in determining whether defendant had the specific intent or mental state required for rape-felony-murder or for premeditated and deliberate first degree murder.[7]

At trial, defendant did not request an instruction under CALJIC No. 4.21, but he did request an instruction under former CALJIC No. 8.41, a voluntary manslaughter instruction that dealt with the effect of diminished capacity caused, inter alia, by intoxication.[8] Because the diminished capacity doctrine had been repealed prior to the date of the alleged offense (see Stats. 1981, ch. 404, §§ 2, 4, pp. 1591-1592), the trial court refused to instruct under former CALJIC No. 8.41. Apparently neither the court, defense counsel, nor the prosecutor recognized, however, that the repeal of

[7] CALJIC No. 4.21, entitled "Voluntary Intoxication—When Relevant to Specific Intent," provides: "In the crime of _____ of which defendant is accused [in Count[s] _____ of the information], a necessary element is the existence in the mind of the defendant of the [specific intent to _____ ] [mental state[s] of _____ ]. [¶] If the evidence shows that the defendant was intoxicated at the time of the alleged crime, you s hould consider that fact in determining whether defendant had such [specific intent] [mental state]. [¶] If from all the evidence you have a reasonable doubt whether the defendant formed such [specific intent] [mental state] [,] [y]ou must find that [he] [she] did not have such [specific intent] [mental state[s]]."

[8] Former CALJIC No. 8.41 provided in relevant part: "Voluntary manslaughter is the intentional and unlawful killing of a human being without malice aforethought. [¶] There is no malice aforethought . . . if the evidence shows that due to diminished capacity caused by mental illness, mental defect or intoxication, the defendant did not have the capacity to form the mental state constituting malice aforethought, even though the killing was intentional, voluntary, deliberate, premeditated, and unprovoked."

the diminished capacity doctrine did not eliminate the potential applicability of CALJIC No. 4.21, which deals with the effect of intoxication on the defendant's actual state of mind, not on his mental capacity. (Compare § 22, subd. (b) with § 22, subd. (a).[9] See also § 28, subds. (a), (b).) The issue of whether CALJIC No. 4.21 should be given was not discussed at trial.

As noted, defendant now contends that his conviction for first degree murder must be reversed because of the trial court's failure to instruct the jury under CALJIC No. 4.21. The Attorney General submits a three-tiered response to defendant's argument. First, he maintains that because the effect of intoxication on a person's mental state is so widely known, a trial court never has a sua sponte duty to instruct a jury on the principles embodied in CALJIC No. 4.21. Second, he claims that even if a court may have a sua sponte duty to give CALJIC No. 4.21 under some circumstances, in this case there was insufficient evidence of intoxication to warrant a sua sponte instruction. Third and finally, he argues that even if the court erred in failing to give CALJIC No. 4.21, the error was harmless.

The Attorney General's initial contention—that CALJIC No. 4.21 need never be given sua sponte—finds no support in the case law. On the contrary, a number of decisions have specifically held that in an appropriate case a trial court has a sua sponte duty to instruct the jury on the principles embodied in CALJIC No. 4.21. (See, e.g., *People* v. *Baker* (1954) 42 Cal.2d 550, 576 [268 P.2d 705]; *People* v. *Sanchez* (1950) 35 Cal.2d 522, 527-528 [219 P.2d 9]; *People* v. *Robinson* (1970) 5 Cal.App.3d 43, 48 [84 Cal.Rptr. 796]; *People* v. *Arriola* (1958) 164 Cal.App.2d 430, 435 [330 P.2d 683].) As these cases suggest, although the potential effect of intoxication on an individual's mental state may be well known to jurors, jurors may not be aware, without an instruction, that while "[n]o act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition" (§ 22, subd. (a)), it is nonetheless legally permissible for jurors to consider a defendant's voluntary intoxication in determining whether he acted with the specific intent or prescribed mental state required for a particular offense. (§ 22, subd. (b).) Thus, when the evidence warrants and the defense is not inconsistent with the defendant's theory of the case (see *People* v. *Sedeno* (1974) 10 Cal.3d 703, 716 [112 Cal.Rptr. 1, 518 P.2d

---

[9] Section 22 provides in relevant part: "(a) No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation or malice aforethought, with which the accused committed the act.

"(b) Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged."

913]), the principle embodied in CALJIC No. 4.21 is one of "the general principles of law" (see *People v. St. Martin* (1970) 1 Cal.3d 524, 531 [83 Cal.Rptr. 166, 463 P.2d 390]) on which the trial court must instruct the jury even in the absence of a request.

The Attorney General's second point—that the evidence presented at the guilt phase in this case was insufficient to warrant such an instruction—is, however, well taken. In *People v. Flannel* (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1], a case involving the question whether there was sufficient evidence of intoxication to support a diminished capacity instruction, we explored the appropriate standard governing a trial court's duty to instruct on an issue. We explained that "[i]n substance when diminished capacity is at issue a trial court first evaluates the evidence. If defendant proffers evidence enough to deserve consideration by the jury, i.e., 'evidence from which a jury composed of reasonable men could have concluded that there was diminished capacity sufficient to negate the requisite criminal intent' [citation], the court must so instruct. A trial court should not, however, measure the substantiality of the evidence by undertaking to weigh the credibility of the witnesses, a task exclusively relegated to the jury. If the evidence should prove minimal and insubstantial, however, the court need not instruct on its effect. [Citations.] In other words, '[t]he court should instruct the jury on every theory of the case, but only to the extent each is supported by substantial evidence.' [Citation.] We likewise note that '[d]oubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused.' [Citations.]" (*Flannel, supra*, 25 Cal.3d at pp. 684-685.)

In the present case, defendant testified that he had about four or five beers at the first bar he visited on the night of the offense, and about four or five additional beers during the two and one-half to three hours that he was in Mr. Barry's, and also testified on cross-examination that he "was higher" on the night of the killing than he was when he was arrested a few days later with a blood-alcohol level measuring .14 percent.[10] Neither defendant nor

---

[10]Shortly before oral argument, defense counsel requested that we take judicial notice of the "Blood Alcohol Concentration Charts" published by the Department of Motor Vehicles to provide guidance to drivers on how the consumption of various amounts of alcohol may affect the blood-alcohol level of an individual, based on an individual's body weight. Relying on the weight of defendant that appears in a police report that was not introduced in evidence and on defendant's testimony that he had consumed eight to ten beers on the evening in question, defense counsel argues in the request that by "extrapolating" from the information contained in the charts, it can be determined that defendant's blood-alcohol level was "probably .20 or higher" at the time of the offense. The Attorney General has opposed the defense request on a variety of grounds.

We need not determine in this case whether the charts in question are a proper subject of judicial notice, because, in any event, the charts cannot properly be used in the manner defendant suggests. By their own terms, the charts at issue do not purport to establish that a

any of the other guilt phase witnesses who were at Mr. Barry's on the night in question, however, testified that defendant's beer drinking had had any noticeable effect on his mental state or actions.[11] Defendant purported to give a detailed account of all of the events of the night in question, and did not suggest that his drinking had affected his memory or conduct. Instead, his defense was simply that he had not sexually assaulted or stabbed Kim at all and that the offenses must have been committed by another individual.

Given this state of the evidence, the governing authorities support the Attorney General's contention that the trial court had no duty to instruct on intoxication. In *People* v. *Bandhauer* (1967) 66 Cal.2d 524 [58 Cal.Rptr. 332, 426 P.2d 900], for example, the court concluded that although the evidence demonstrated that the defendant had had six or seven beers in several bars in the hours immediately preceding the crime, because there was "no evidence that his drinking had any substantial effect on him, or that he was so intoxicated that he did not or could not harbor malice" (*id.* at p. 528), the trial court had not erred in refusing to give an intoxication instruction. Similarly, in *People* v. *Flannel, supra,* 25 Cal.3d 668, 685-686, the court held that while there was evidence that the defendant had consumed at least six cans of beer and several shots of whiskey on the day of the crime and the defendant had testified somewhat equivocally as to his own intoxication, because all of the eyewitnesses had testified that the defendant was "acting normal" and that the alcohol had "no effect" on his behavior the trial court did not err in declining to give an intoxication instruction.

 ██ ██ ██ ██ Because in this case there was no evidence presented at the guilt phase suggesting that defendant's drinking had affected his mental state in a manner that might negate the specific intent or mental state required for first degree murder, the trial court did not err in failing to instruct the jury pursuant to CALJIC No. 4.21 with regard to the first degree murder charge.[12]

---

person of a given weight who has ingested a certain number of drinks will have a certain blood-alcohol level, or even that he or she will probably have such a level within a given margin of error. Instead, the document expressly provides that "the charts have been constructed so that fewer than 5 persons in 100 will exceed these limits when drinking the stated amounts on an empty stomach." Thus, many, perhaps most, persons who consume the specified number of drinks will have a lower blood-alcohol level than that indicated on the charts.

Accordingly, defendant's blood-alcohol level cannot be "extrapolated" from the charts. Any attempt to prove his blood-alcohol level from the number of drinks he consumed would require expert evidence taking account of defendant's individual characteristics. No such evidence was offered at trial.

[11] As noted, defendant did present one witness at the penalty trial who testified that defendant appeared intoxicated on the night in question, but no similar testimony was presented at the guilt trial.

[12] It is true that the comments of both the trial court and the prosecutor during the discussion on instructions suggest that each of them felt that the evidence of alcohol consumption

## III. Special Circumstance Issue

### Effect of Failure to Give CALJIC No. 4.21 on Special Circumstance Findings

█ In addition to contending that the failure to instruct under CALJIC No. 4.21 tainted the first degree murder conviction—a contention we have just rejected—defendant also contends that the failure to give CALJIC No. 4.21 undermined the jury's special circumstance findings. At trial, the jury was instructed—in accordance with the then-existing state of the law (see *Carlos v. Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862])—that specific intent to kill was an element of both the rape-murder and sodomy-murder special circumstances. In finding the special circumstances to be true, the jury necessarily found that defendant had acted with the specific intent to kill. Defendant contends, however, that the special circumstance findings must be reversed because the trial court's failure to give CALJIC No. 4.21 left the jury without the knowledge that it could consider defendant's intoxication in determining whether he acted with the specific intent to kill.

The claim is untenable for two separate reasons. First, in *People v. Anderson* (1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306], this court overruled *Carlos v. Superior Court, supra*, 35 Cal.3d 131, and concluded that specific intent to kill is not an element of the felony-murder special circumstance under the 1978 death penalty law; because the offense at issue preceded *Carlos* (cf. *In re Baert* (1988) 205 Cal.App.3d 514 [252

---

that had been presented at the guilt phase was sufficient to warrant instructions on the lesser included offenses of second degree murder and voluntary manslaughter. Although the trial court's view of the strength of the evidence of intoxication is entitled to some weight on appeal (see, e.g., *People v. Stevenson* (1978) 79 Cal.App.3d 976, 985 [145 Cal.Rptr. 301]), the record in this case reveals that with respect to a wide range of issues both the court and prosecutor took pains to "bend over backwards" to avoid creating a potential basis for reversal, and the court's and prosecutor's comments on this point may well simply reflect their recognition of the wisdom of being cautious not to improperly limit the scope of the jury's deliberations.

In any event, whatever the trial court's assessment of the evidence may have been, the governing authorities cited above establish that the evidence presented at the guilt phase was insufficient to require an instruction on intoxication.

At oral argument, defendant alternatively argued that the People should be "estopped" from asserting that the evidence was insufficient to support an intoxication instruction in view of the prosecutor's reference to defendant's drinking in his closing argument at the guilt phase. Even if we assume that the estoppel doctrine could apply in this context under some circumstances, the prosecutor in this case never suggested that defendant's drinking had affected any mental state required for first degree murder, but simply speculated that defendant's drinking may have lessened his sexual inhibitions, asking the jury: "What's a reasonable inference about what he was thinking when they went out in the back?" We conclude that nothing in the prosecutor's argument gave rise to a duty to instruct under CALJIC No. 4.21.

Cal.Rptr. 418]) and defendant's claim goes only to the intent-to-kill element, in light of *Anderson* any error would not affect the validity of the special circumstance findings. Second, for the same reasons that we have concluded that the evidence was insufficient to require an instruction under CALJIC No. 4.21 with respect to the first degree murder charge (see *ante*, at p. 1181), the evidence was similarly insufficient to require such an instruction in the special circumstance context.

## IV. PENALTY PHASE ISSUES

### EVIDENTIARY RULINGS—PROSECUTION CASE

#### A. VALIDITY OF STIPULATION TO PRIOR CONVICTIONS

At the outset of the second penalty trial, defense counsel indicated that, as at the first penalty trial, defendant would be stipulating that he had suffered three prior felony convictions: a 1978 rape conviction, a 1978 conviction of possession of a concealed weapon, and a 1980 conviction of receiving stolen property. In voir dire conducted by the district attorney, defendant indicated that he understood that by admitting the priors he was giving up his right to have live witnesses presented whom he could confront and cross-examine, that the jury would be told that "there is no doubt about it, you were convicted of those three prior felony convictions," and that the priors would be used, as they had been used in the first penalty trial, as aggravating factors in the sentencing determination. Defendant confirmed that he wanted to admit the priors. Pursuant to the stipulation, the jury was informed at the penalty trial that defendant had admitted that he had suffered the three prior convictions.

Defendant now contends, however, that his stipulation to the priors was improper under *In re Yurko* (1972) 10 Cal.3d 857 [112 Cal.Rptr. 513, 519 P.2d 561], because, during the voir dire at the second penalty trial, defendant did not expressly waive his privilege against self-incrimination or his right to a jury or court trial on the prior convictions. In response, the Attorney General argues that *Yurko* is not applicable in this context, because defendant's stipulation to the priors was not analogous to the admission of the truth of a sentence enhancement as in *Yurko*, but was instead comparable to a stipulation to the admission of a subsidiary evidentiary matter.

The Attorney General's position is well taken. Unlike the defendant's stipulation in *In re Yurko, supra*, 10 Cal.3d 857, which automatically subjected the defendant to an increased sentence under the California habitual criminal law and thus was somewhat comparable to a guilty plea as to

which a waiver of rights is constitutionally required (see *Boykin* v. *Alabama* (1969) 395 U.S. 238, 242 [23 L.Ed.2d 274, 279, 89 S.Ct. 1709]; *In re Tahl* (1969) 1 Cal.3d 122, 132-133 [81 Cal.Rptr. 577, 460 P.2d 449]), defendant's admission of the priors in this case did not inevitably subject defendant to an increased penalty. Here, the priors were simply evidence in aggravation that the jury was to consider along with all of the other aggravating and mitigating evidence presented at the penalty phase. Neither *Yurko* nor any other California decision requires an on-the-record waiver of rights by the defendant when the defendant or defense counsel stipulates to the admission of a subsidiary item of evidence of this nature. (See *People* v. *Lang* (1989) 49 Cal.3d 991, 1038 [264 Cal.Rptr. 386, 782 P.2d 627]; *People* v. *Robertson* (1989) 48 Cal.3d 18, 38-42 [255 Cal.Rptr. 631, 767 P.2d 1109].)[13]

### B. Admission of Facts Underlying Prior Convictions

■ Defendant contends that even if his stipulation to the three prior felony convictions was properly obtained and admitted in evidence, the trial court erred in permitting the prosecution to go beyond the face of the prior convictions to present additional evidence of the specific circumstances of two of the prior offenses, the prior rape and the possession-of-a-concealed-weapon incident. Because the trial court found that the rape and concealed-weapon offenses constituted criminal activity involving "the use . . . or implied threat to use force of violence" within the meaning of factor (b) of section 190.3 (factor (b)),[14] it concluded that the prosecution was authorized to introduce evidence of the underlying facts of the offenses and was not limited to relying on the record of conviction.

Defendant takes issue with the trial court's conclusion, arguing that when the prosecution elects to introduce a felony conviction "it cannot . . . engage in overkill by also introducing evidence of the facts underlying the

---

[13] In *People* v. *Hall* (1980) 28 Cal.3d 143, 157, footnote 9 [167 Cal.Rptr. 844, 616 P.2d 826], in which the defendant was charged with possession of a concealable weapon by an ex-felon, the court suggested that, in that context, a defendant's admission of ex-felon status "shares several key characteristics" with the admission of a prior in the *Yurko* context, and observed in dictum that "trial courts in the future would be well-advised to assure the record adequately reflects the fact that a defendant is advised of any constitutional rights waived when stipulating to the status of an ex-felon." As the cases cited in text demonstrate, however, the *Hall* dictum has not been extended outside the ex-felon-in-possession-of-a-weapon context, and has not been interpreted to require a waiver of rights with respect to ordinary evidentiary stipulations.

[14] Section 190.3 provides in relevant part: ". . . In determining the penalty, the trier of fact shall take into account any of the following factors if relevant: . . . [¶] (b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence."

All further references to designated "factors"—e.g., factor (b), factor (c), factor (k)—are to the factors listed in section 190.3.

convictions." We have, however, specifically rejected an identical claim with respect to criminal activity relevant to factor (b) in numerous recent decisions (see, e.g., *People* v. *Karis* (1988) 46 Cal.3d 612, 638-641 [250 Cal.Rptr. 659, 758 P.2d 1189]; *People* v. *Keenan* (1988) 46 Cal.3d 478, 526 [250 Cal.Rptr. 550, 758 P.2d 1081]; *People* v. *Melton* (1988) 44 Cal.3d 713, 754 [244 Cal.Rptr. 867, 750 P.2d 741]), and defendant provides no basis for reexamining those holdings.

## C. ADMISSION OF HAIR SPRAY CAN INCIDENT

In addition to arguing that it was improper to admit any evidence beyond the record of the prior convictions, defendant takes particular issue with the admission of the testimony of the prior rape victim describing defendant's insertion of a hair spray can into her vagina. Defendant argues that because the current statute prohibiting the penetration of genital or anal openings by a foreign object—section 289—did not go into effect until 1979, after the date of the incident in question, the incident did not constitute violent "criminal activity" within the meaning of factor (b) (see *ante*, at p. 1184, fn. 14), and thus should not have been admitted. (See, e.g., *People* v. *Phillips* (1985) 41 Cal.3d 29, 72 [222 Cal.Rptr. 127, 711 P.2d 423].)

For a number of reasons, defendant's claim lacks merit. First, even before the adoption of the current "foreign object" statute, the conduct in question was unquestionably criminal activity—at the least, a battery (§ 242)—involving force or violence. Thus, the incident could properly have been admitted as an aggravating circumstance under factor (b). (See, e.g., *People* v. *Balderas* (1985) 41 Cal.3d 144, 201 [222 Cal.Rptr. 184, 711 P.2d 480].)

Second, in any event, in this case the evidence was properly admitted as part of the circumstances of the prior rape offense. As noted, the hair spray can incident occurred during the course of the on-going sexual assault for which defendant was convicted of rape; the rape victim could properly relate this occurrence in describing the circumstances of the rape. (See, e.g., *People* v. *Keenan, supra*, 46 Cal.3d 478, 526; *People* v. *Melton, supra*, 44 Cal.3d 713, 756-757.) Indeed, at the conclusion of the penalty trial, the prosecution—in accordance with the procedure suggested in *People* v. *Robertson* (1982) 33 Cal.3d 21, 55, footnote 19 [188 Cal.Rptr. 77, 655 P.2d 279]—specified that the only "other crimes" on which it was relying as aggravating circumstances were the three prior offenses of which defendant had been convicted, and the trial court specifically instructed the jury that "you may not consider any evidence of any other crime as an aggravating circumstance; the above three (3) crimes are the only ones you may consider." Thus, in this case, the jury was told not to consider the incident as separate "criminal activity" under factor (b).

There was no error in admitting this evidence.

## D. ADMISSION OF FACTS UNDERLYING CONCEALED WEAPON CONVICTION

 Defendant next contends that the trial court erred in admitting evidence of the facts underlying his conviction for possession of a concealed weapon. As we have seen, the trial court admitted the testimony of two nurses who worked at the infirmary of the California Youth Authority facility at which defendant was confined, who stated that they were present when defendant dropped a sharpened eight-and-one-half-inch table knife that had been concealed under his clothes. After the knife dropped, defendant handed it to one of the nurses without making any threatening statements or gestures.

Defendant asserts that even if his section 12020 conviction for possessing the concealed knife was a prior felony conviction that was admissible under factor (c),[15] his conduct did not involve "the use or attempted use of force or violence or . . . [the] express or implied threat to use force or violence" within the meaning of factor (b), and therefore evidence of the underlying facts of the incident should not have been admitted at the penalty phase. (See, e.g., *People* v. *Boyd* (1985) 38 Cal.3d 762, 776 [215 Cal.Rptr. 1; 700 P.2d 782].) The Attorney General responds that possession of a concealed sharpened knife in a California Youth Authority facility is criminal activity that involves "the implied threat to use force or violence" under factor (b).

*People* v. *Harris* (1981) 28 Cal.3d 935, 962-963 [171 Cal.Rptr. 679, 623 P.2d 240] directly supports the Attorney General's position. In *Harris,* the court, applying a virtually identical provision of the 1977 death penalty law (see former § 190.3, factor (b)), upheld the admission of evidence that the defendant had possessed a wire garotte and a prison-made knife while in jail, concluding that such possession "clearly involved an implied threat to use force or violence." (28 Cal.3d at p. 963.)

The fact that defendant in this case did not actually use the sharpened knife in a threatening or violent manner when his possession of the weapon was discovered in the school infirmary does not mean that he did not engage in criminal conduct involving the implied threat to use force or violence. The concealed possession of the type of "dirk" or "dagger" involved here (see *In re Quintus W.* (1981) 120 Cal.App.3d 640, 643-645 [175 Cal.Rptr. 30]) is prohibited precisely because such an implement is a "classic

---

[15] Factor (c) permits the trier of fact at the penalty phase to take into account "the presence or absence of any prior felony conviction."

instrument[ ] of violence" (*People* v. *Grubb* (1965) 63 Cal.2d 614, 620 [47 Cal.Rptr. 772, 408 P.2d 100]) that is "normally used only for criminal purposes." (See *People* v. *Wasley* (1966) 245 Cal.App.2d 383, 386 [53 Cal.Rptr. 877].)

Thus, we conclude that there was no error in admitting this evidence. Defendant, of course, was free to present any additional evidence of the circumstances of the incident that would be relevant to the jury's assessment of the incident's probative value with respect to defendant's propensity for violence.[16]

### E. ADMISSION OF CONCEALED WEAPON CONVICTION AS "FELONY" CONVICTION

In a somewhat related argument, defendant contends that his trial counsel was ineffective in failing to object to the prosecution's use of his conviction under section 12020 as a prior felony conviction for purposes of factor (c).

In support of his argument, defendant points out that section 12020 is a "wobbler"—i.e., a crime that is punishable as either a felony or misdemeanor—and that section 17, subdivision (c) provides that when a defendant is committed to the California Youth Authority for such a crime and then is discharged from the Youth Authority, the offense "shall . . . be deemed a misdemeanor for all purposes." Defendant asks us to take judicial notice of court records indicating that he was committed to the Youth Authority for his section 12020 offense in March 1979 and was discharged from the Youth Authority in January 1981. Defendant contends that his trial counsel should have been aware of these facts and should have recognized that, under section 17, subdivision (c), his section 12020 conviction should be deemed a misdemeanor rather than a felony. Defendant contends that under the circumstances his trial counsel was ineffective in advising him to stipulate that his section 12020 conviction was a prior felony conviction for purposes of factor (c).

The Attorney General does not object to our taking judicial notice of the court records to which defendant refers, and does not challenge defendant's assertion that, in light of section 17, subdivision (c), trial counsel could have succeeded in having defendant's section 12020 conviction designated a misdemeanor, rather than a felony.[17] The Attorney General argues, however,

---

[16] In the first penalty trial, defendant testified that the knife was handed to him while he was in line at the infirmary and that he intended simply to leave the knife in the clinic. Defendant did not testify at the second penalty trial.

[17] Although the Attorney General has not contested the applicability of section 17, subdivision (c), in *People* v. *Lassiter* (1988) 202 Cal.App.3d 352 [248 Cal.Rptr. 320] the Court of Ap-

that defendant's trial counsel had a reasonable tactical basis for stipulating to the admission of the section 12020 conviction as a felony conviction. The Attorney General points out that, prior to both the first and second penalty trials, trial counsel argued vigorously that the prosecution should not be permitted to go behind the record of any admitted prior felony conviction to introduce evidence of the facts underlying such conviction. (Cf. *People* v. *Hall, supra*, 28 Cal.3d 143, 156.) The Attorney General asserts that counsel would not have been able to make or preserve this argument with respect to the evidence underlying the section 12020 conviction if that conviction had not been admitted as a felony conviction under section 17, subdivision (c).

The record on appeal does not reveal whether or not defendant's trial counsel was aware that it could be argued that defendant's section 12020 conviction should be deemed a misdemeanor conviction rather than a felony conviction.[18] The record does, however, support the Attorney General's claim that trial counsel's decision to advise defendant to stipulate to the prior felony convictions was a strategic one, which formed the foundation for counsel's motion to exclude evidence of the facts underlying the admitted prior convictions. Although, as we have discussed above, recent decisions have made it clear that a defendant's stipulation to a prior felony conviction does not preclude the prosecution from presenting evidence of the facts underlying such conviction if the criminal activity in question falls within the aegis of factor (b) (see *ante*, at pp. 1184-1185), this issue had not been resolved at the time of defendant's trial and trial counsel's decision to have defendant admit the prior convictions appears to have been a reasonable tactical decision. Although it is certainly possible that trial counsel was unaware that the section 12020 conviction might be deemed a misdemeanor conviction in view of section 17, subdivision (c), and that counsel would have made a different tactical decision if he had that knowledge, on this

peal concluded that a defendant who has been committed to the California Youth Authority for a wobbler obtains the benefit of section 17, subdivision (c) only when the defendant has been honorably discharged from the Youth Authority and not when the defendant has been dishonorably discharged from the Youth Authority. In the present case, the records of which defendant has asked us to take judicial notice indicate that defendant was dishonorably discharged from the Youth Authority and, thus, under *Lassiter*, it appears that defendant would not be entitled to claim the benefits of section 17, subdivision (c).

Defendant, however, challenges the *Lassiter* court's interpretation of section 17, subdivision (c), contending that that court's reading of the section is inconsistent with the language and legislative history of the provision. We need not resolve that issue in this case because, as we explain hereafter, even if section 17, subdivision (c) operated to reduce defendant's possession of a concealed weapon conviction to a misdemeanor upon his dishonorable discharge from the Youth Authority, defendant's ineffective-assistance-of-counsel claim is nonetheless without merit.

[18] Trial counsel, in urging exclusion of the evidence underlying the concealed weapon conviction, argued initially that the incident did not involve an actual or implied threat of violence, but when the trial court rejected that claim, counsel did not raise any question with regard to the status of the conviction as a felony.

record we cannot say that there is no possible reasonable tactical explanation for trial counsel's actions. Accordingly, defendant has not established that his counsel's performance was deficient. (See, e.g., *People* v. *Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

Furthermore, even if defendant could show that trial counsel's conduct was deficient in this regard, defendant has not established the requisite prejudice to sustain an ineffective-assistance-of-counsel claim. As our analysis of the immediately preceding issue demonstrates, the facts underlying defendant's section 12020 conviction were properly admitted under factor (b) in any event. Thus, even if the section 12020 conviction had not been considered by the jury as a prior felony conviction under factor (c), the jury would still have been aware that defendant had suffered two prior felony convictions, and would also have known that defendant had possessed a concealed knife while confined at a California Youth Authority school. (See *People* v. *Burton* (1989) 48 Cal.3d 843, 862 [258 Cal.Rptr. 184, 771 P.2d 1270].) Under these circumstances, even if defense counsel erred in permitting the jury to consider the section 12020 conviction as a prior felony conviction under factor (c), we cannot find that the error was sufficiently serious "to undermine confidence in the outcome" of the jury's penalty determination. (See *Strickland* v. *Washington* (1984) 466 U.S. 668, 693-694 [80 L.Ed.2d 674, 697-698, 104 S.Ct. 2052].)

EVIDENTIARY RULINGS—DEFENSE CASE

F. IN LIMINE RULING AS TO PROPOSED DEFENSE WITNESS

At the outset of the defense case, defense counsel advised the court outside the presence of the jury that he intended to call as a witness a police officer who had investigated the prior rape offense that had been described in detail by the rape victim during the prosecution's case-in-chief. Counsel indicated that he intended to establish that defendant, when apprehended for the prior rape, had told the officer that he had been drinking and had taken drugs in the hours before the rape. Defendant had called the police officer as a witness in the initial penalty trial, and at the prior trial the court had permitted the prosecution to elicit from the officer, on cross-examination, additional statements made by the defendant at the time of his arrest describing his participation in a residential burglary that same night. Anticipating that the prosecution would attempt to elicit the same testimony on cross-examination of the officer in the second penalty trial, defendant requested a pretrial hearing on his motion to preclude the officer from testifying as to defendant's statements regarding the burglary.

At the conclusion of the hearing, the court ruled that the officer would be permitted to testify to defendant's statements concerning the residential burglary. The court explained that the jury could reasonably find defendant's description of the burglary relevant in judging the credibility of his additional statements that he was under the influence of alcohol or drugs when he committed the rape earlier that same night. Although the court recognized that defendant's admission of the burglary might conceivably be prejudicial to the defendant, it concluded that, in light of the gravity of the rape, any prejudice would be "insignificant" or "de minimis." After the court's ruling, defendant did not call the officer as a witness.

■■■ Defendant now contends that the trial court erred in its *in limine* ruling, asserting that defendant's statements to the officer regarding the burglary were likely to be so prejudicial to the defendant and had so little probative value with respect to defendant's state of mind at the time of the rape that the trial court abused its discretion under Evidence Code section 352 in concluding that the statements should be admitted.[19] The Attorney General argues that the trial court properly exercised its discretion.

We conclude that the trial court did not abuse its discretion under Evidence Code section 352. On this record, the court could reasonably find that because defendant was proposing to rely on a portion of a statement that he had made to the officer to show that he was under the influence of alcohol and drugs when he committed the rape, the prosecution should be permitted to put defendant's entire statement before the jury so it could decide whether other portions cast doubt on defendant's claimed intoxicated state. (See Evid. Code, § 356.) Although the admission of the statements concerning the burglary posed some potential of prejudice since they disclosed additional criminal conduct that would not otherwise be admissible, the trial court indicated that it would attempt to minimize the prejudice by giving the jury an appropriate limiting instruction and, in any event, we think the trial court could properly conclude that, in view of the extremely heinous nature of the rape, the additional prejudice that defendant would suffer from the disclosure of his admission of a burglary was not so substantial as compared to the relative probative value of the statements to justify exclusion under Evidence Code section 352.

Accordingly, we find no error in the trial court's *in limine* ruling.

---

[19] Although defendant also contends that the record fails to demonstrate that the trial court engaged in the process of weighing probative value against prejudice (see *People* v. *Green* (1980) 27 Cal.3d 1, 24 [164 Cal.Rptr. 1, 609 P.2d 468]), the record reveals extensive discussion between the court and counsel concerning the weighing process, and the court's ultimate ruling was clearly based on its determination that the probative value of the statements outweighed the potential prejudice.

### G. Cross-examination of Defendant's Mother

Defendant's mother testified on his behalf with regard to his difficult childhood. Her testimony on direct examination related to a number of adverse circumstances that defendant faced from his birth in 1959 until his father's death in 1973.

Defendant's mother testified that defendant's father was an alcoholic who frequently had difficulty providing for the family. When defendant was four, the family moved from Merced to Orange County in the hopes of improving their financial situation. After the move, defendant had a number of serious childhood illnesses, including a severe episode of "red measles"— accompanied by extremely high fever and hallucinations—which led to hearing and vision problems.

Defendant's mother stated that the move to Orange County did not improve the family's economic situation. Her husband's drinking increased and he repeatedly beat her, often in front of their children. When defendant was nine years old, her husband's violent conduct towards her led her to file for divorce. Thereafter, she worked long hours outside the home to try to provide for her four children, leaving defendant and his siblings with little supervision.

Although her husband often mistreated her, defendant had always had a very close relationship with his father. When defendant was 13, however, defendant's father learned that he had cirrhosis of the liver and had only a few months to live. After receiving the news, defendant's father returned to Merced, where his own family lived. Because of their close relationship, defendant went with his father and lived with him until his father's death.

On cross-examination, defendant's mother first acknowledged that both she and her husband had always been particularly protective and loving of defendant, who was their youngest child, and that neither she nor her husband had ever physically abused defendant. Thereafter, over defense counsel's objection that the questioning was beyond the scope of the direct examination, the trial court permitted the prosecutor to question defendant's mother with regard to defendant's conduct from 1973 to 1977, after defendant's father's death. In response to the prosecutor's questions, defendant's mother admitted that, during this latter period, defendant became "out of [her] control," went to juvenile court "off and on," was not attending school, had been arrested for burglary, and had used heroin and other drugs.

Defendant contends, on appeal, that the cross-examination of his mother both exceeded the scope of the direct examination and elicited

testimony with regard to nonviolent criminal activity that was inadmissible under factor (b) or any other factor. The Attorney General argues, in response, that once the defense introduced evidence of defendant's background to be considered by the jury as mitigating evidence under factor (k),[20] the prosecutor was entitled to elicit evidence of other incidents in defendant's background "to present a complete picture of [defendant's] character and background" in order to permit the jury to determine whether defendant's "character and background called for a sentence of less than death."

The Attorney General relies on this court's decisions in *People* v. *Boyd*, *supra*, 38 Cal.3d 762, 775-776, and *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 790-792 [230 Cal.Rptr. 667, 726 P.2d 113], to support the asserted propriety of the cross-examination. In *Boyd*, after explaining that the prosecution may not introduce evidence of a defendant's alleged "bad character" in its penalty phase case-in-chief unless the evidence bears on one of the specifically enumerated aggravating factors listed in section 190.3, we went on to observe that if the defense presents mitigating evidence under "expanded factor (k)," "prosecution rebuttal evidence would be admissible as evidence tending to 'disprove any disputed fact that is of consequence to the determination of the action.'" (*Boyd, supra*, 38 Cal.3d at pp. 775-776.) In *Rodriguez*, we relied on *Boyd* in holding that a prosecutor could properly refer, in his closing penalty phase argument, to an incident in which the defendant had allegedly reached for a shotgun in the backseat of his vehicle when stopped by a police officer, to rebut evidence the defense had presented suggesting defendant "was a kind, loving, contributive member of his community, regarded with affection by neighbors and family." (*Rodriguez, supra*, 42 Cal.3d at pp. 791-792.) The Attorney General suggests that under *Boyd* and *Rodriguez*, when a defendant "opens the door" by presenting any mitigating evidence relating to a defendant's background or character, the prosecution has broad discretion to present other evidence of the defendant's background to give the jury "a more balanced picture of his personality." (*Rodriguez, supra*, 42 Cal.3d at p. 791.)

The Attorney General's argument overlooks a significant passage of the *Rodriguez* decision, in which we explained the appropriate limits of our holding in that case. After concluding that there was no impropriety in the prosecution's closing argument comment in the *Rodriguez* trial, we emphasized: "Nothing in our discussion is meant to imply that *any* evidence

---

[20]Pursuant to *People* v. *Easley* (1983) 34 Cal.3d 858, 878, footnote 10 [196 Cal.Rptr. 309, 671 P.2d 813], the jury was instructed that, under factor (k), it could consider "any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime, and any other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death."

introduced by defendant of his 'good character' will open the door to *any and all* 'bad character' evidence the prosecution can dredge up. As in other cases, the scope of rebuttal must be specific, and evidence presented or argued as rebuttal must relate directly to a particular incident or character trait defendant offers in his own behalf. Here, for example, appellant presented evidence through family members that he was gentle and in the habit of avoiding violent confrontations. The prosecutor's reference to the 'shotgun incident' was thus proper rebuttal to this specific asserted aspect of appellant's personality." (*People* v. *Rodriguez, supra*, 42 Cal.3d at p. 792, fn. 24, italics in original.)

In the present case, unlike in *Rodriguez,* much of the evidence introduced by the prosecution on cross-examination of defendant's mother was not responsive to the evidence presented by the defense. As we have seen, on direct examination defendant's mother did not testify generally to defendant's good character or to his general reputation for lawful behaviors, but instead testified only to a number of adverse circumstances that defendant experienced in his early childhood—e.g., an alcoholic father who did not provide adequately for his family and who beat his mother, a number of serious illnesses leading to some disability, his parents' divorce and the early death of his father. Although the prosecution was very properly permitted to bring out, on cross-examination, a number of facts that helped place the mother's direct examination testimony in proper perspective—e.g., the fact that while his father had beaten his mother, he had never beaten defendant, and the fact that defendant had always been loved by both his mother and father—the trial court also permitted the prosecution to go beyond these aspects of defendant's background and to introduce evidence of a course of misconduct that defendant had engaged in throughout his teenage years that did not relate to the mitigating evidence presented on direct examination.

As the Attorney General implicitly acknowledges, the incidents of misconduct that the prosecution elicited from defendant's mother—disclosing defendant's absences from school, his arrest for burglary, and his use of heroin—were not incidents of violent criminal activity that were properly admissible under factor (b) or any other statutorily designated factor. Because the defense had presented no evidence to suggest that defendant had not engaged in any such misconduct in his childhood, this evidence was not proper rebuttal evidence and went beyond the scope of permissible cross-examination. Accordingly, we conclude that the trial court erred in permitting the prosecution to question defendant's mother with regard to such incidents.

Although we find that the trial court erred in this regard, for a number of reasons we also conclude that there is no reasonable possibility that the

error could have affected the judgment in this case and thus that the error does not warrant reversal of the death penalty judgment. (See, e.g., *People* v. *Brown* (1988) 46 Cal.3d 432, 446-448 [250 Cal.Rptr. 604, 758 P.2d 1135].) First, although the trial court's error did permit the prosecution to bring to the jury's attention a number of incidents of criminal misconduct that should not properly have been admitted, the incidents in question were relatively innocuous in comparison with the additional incidents of prior criminal activity that were properly admitted in the prosecution's case-in-chief—i.e., the prior forcible rape and the possession of a concealed weapon in a California Youth Authority facility—and the defendant himself presented evidence at the penalty phase of his past use of drugs. Second, the trial court specifically instructed the jury that it could not consider any prior criminal activity, other than the three crimes that the prosecution had presented in its case-in-chief, as an aggravating circumstance; this instruction minimized the danger that the jury would have used the evidence which was brought out on cross-examination for an improper purpose. Finally, the prosecutor did not dwell on this evidence or attempt to inflate its importance in closing argument. Under these circumstances, we cannot find there is a reasonable possibility that the error affected the verdict. (See, e.g., *People* v. *Heishman* (1988) 45 Cal.3d 147, 191 [246 Cal.Rptr. 673, 753 P.2d 629].)

## H. Ramos Claim

During its penalty phase case, the defense called a retired prison chaplain who had worked at San Quentin Prison to testify about the attitudes of prisoners on death row. The chaplain testified on direct examination that during their confinement some death row inmates became "more integrated, more insightful and more perceptive about life and themselves."

In the course of the prosecutor's cross-examination of the chaplain, the following colloquy occurred:

"Q [by the district attorney]: A number of people who you got to know on death row, subsequently their sentences were changed, true?

"A: Yes, many.

"Q: . . . And some of those people were released, as a matter of fact, true?

"A: Yes.

"Q: Did you ever do any tracking of the people who you had gotten to know on death row, and you saw that they were religious, to determine

whether or not their interest in religion was maintained when they were subsequently released into society?

"A: I haven't been intimately identified with people that have been on the row and then have left, to answer that with any specific case that I can recall.

". . . . . . . . . . . . . . . . . . .

"Q: And after these people were once on death row, were released back into society, to be honest with us, you just don't have any idea whether they maintained any interest in religion or not?

"A: Right. No, of course. That one facet of it. But I know that many, many who have been on the death row have adjusted into civil life and have disappeared into the population so you never hear of them again.

"Q: Many have and a few have not, true?

"A: Right."

On redirect examination, defense counsel began asking questions in an attempt to have the chaplain explain that the release of death row prisoners, to which the prosecutor had referred, occurred when an earlier death penalty law was invalidated. The trial court interrupted defense counsel and admonished the jury that "we are talking about an entirely new and different sequence here. [¶] So, as I said, the fact that they did away with the death penalty back in 1960 or '62 and so forth, and the people were released back into the system, and so forth, you are to draw no inference that that is going to happen in this case. [¶] And you are admonished that death, as I emphasized to you, means that the defendant will be executed. And life imprisonment without possibility of parole means he will be in prison the rest of his life. [¶] So, as I said these questions are not asked in any context that you are to draw any inference that something other than what I have indicated to you. [¶] You have two possible acts. And those are what they are. So I think that clears it up."

The jury was then dismissed for a recess, and defense counsel moved for a mistrial, contending that the prosecutor, in violation of this court's decision in *People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430], had intentionally injected an impermissible consideration into the sentencing calculus, namely, the possibility that a person sentenced to life without possibility of parole might be released from prison. The prosecutor maintained that he was merely attempting to have the chaplain acknowledge that

the character changes in death row inmates to which the chaplain had referred had not always been maintained when circumstances changed and may have been feigned. He insisted that he had not attempted indirectly to suggest that a life-without-possibility-of-parole sentence could result in defendant's release.

The trial court denied the motion for mistrial, observing that while it was surprised that defense counsel had not objected sooner to the prosecutor's line of questions, it felt that its prompt admonition to the jury had cured any problem.

 Defendant now claims that the prosecutor's questions constituted intentional misconduct that could not be cured by the trial court's admonition. In response, the Attorney General argues that there was no misconduct and, in any event, no prejudice.

Although the record does not suggest to us that the prosecutor's questions were intended to inject an improper factor into the jury's sentencing calculus, the trial court properly recognized that the questions did at least have the potential of introducing an extraneous and possibly prejudicial consideration into the jury's penalty determination. In view of the trial court's prompt clarification of the matter, however, we conclude that the trial court did not err in refusing to declare a mistrial.

As the trial court's quoted comments suggest, well before the quoted colloquy occurred the trial court had made a point of specifically advising the jurors during the pretrial jury voir dire that they were to decide the question of the appropriate penalty on the understanding that a sentence of death meant that defendant would be executed and that a sentence of life without possibility of parole meant that defendant would never be released from prison. The court's reiteration of that point in response to the prosecutor's questioning of the chaplain should have eliminated any potential misunderstanding.[21] Under these circumstances, we conclude that reversal of the judgment is not warranted.

## PENALTY PHASE INSTRUCTIONS

## I. HARRIS CLAIM

 Relying on the plurality opinion in *People* v. *Harris* (1984) 36 Cal.3d 36, 66 [201 Cal.Rptr. 782, 679 P.2d 433], defendant contends that

---

[21] In addition, in its instructions to the jury at the conclusion of the penalty phase, the trial court included an instruction that stated: "A sentence of life without possibility of parole means that the defendant will remain in state prison for the rest of his life and will not be paroled at any time."

the trial court erred in failing to instruct the jury that the two special circumstances findings—the rape-murder special circumstance and the sodomy-murder special circumstance—should be considered as only one special circumstance for purposes of determining penalty because the two arose out of an indivisible course of conduct. In *People* v. *Melton, supra*, 44 Cal.3d 713, 765-769, however, a majority of the court declined to adopt this portion of the *Harris* plurality opinion, and held that it is not improper for a penalty jury to take into consideration the fact that a murder was committed in the course of two statutorily enumerated felonies, even if the felonies were part of an indivisible course of conduct.

## J. Factor (b) Instruction

With respect to factor (b), the trial court instructed the jury (1) that evidence had been introduced for the purpose of showing that defendant had been convicted of forcible rape, possession of a deadly weapon and receiving stolen property, (2) that before it could consider any of the crimes as an aggravating factor it must be satisfied beyond a reasonable doubt that defendant was, in fact convicted of such crimes, and (3) that it could not consider "any evidence of any other crime as an aggravating circumstance."[22]

Defendant now contends that this instruction was inadequate because it did not inform the jury that it could only consider the *testimonial evidence* of the circumstances underlying the prior convictions if it found that *that evidence*—as distinguished from the convictions themselves—had been proven beyond a reasonable doubt. (Cf. *People* v. *Robertson, supra*, 33 Cal.3d 21, 53-55.) Because the instruction specifically advised the jury that it could not consider evidence of any crime other than the crimes of which defendant had been convicted as an aggravating circumstance, however, the instruction did not leave the jury free to consider other actions by the defendant that were disclosed by the testimony of the rape victim as distinct aggravating circumstances under factor (b). Accordingly, we find no error. (See, e.g., *People* v. *Lang, supra*, 49 Cal.3d 991, 1040.)

---

[22] The court's instruction read in full: "Evidence has been introduced for the purpose of showing defendant Richard Raymond Ramirez has been convicted of the crimes of forcible rape, P.C. 261, possession of a deadly weapon, P.C. 12020, and receiving stolen property, P.C. 496, prior to the offense of murder in the first degree of which he has been found guilty in this case. [¶] Before you may consider any of such crimes as an aggravating circumstance in this case, you must first be satisfied beyond a reasonable doubt that the defendant, Richard Raymond Ramirez, was, in fact, convicted of such prior crimes. You may not consider any evidence of any other crime as an aggravating circumstance. The above three crimes are the only ones you may consider."

### K. INAPPLICABLE MITIGATING FACTORS

Defendant contends that the trial court erred in failing to delete inapplicable mitigating factors when it listed the factors that the jury should consider in determining penalty. Numerous recent decisions have rejected an identical contention. (See, e.g., *People* v. *Melton, supra*, 44 Cal.3d 713, 770; *People* v. *Miranda* (1987) 44 Cal.3d 57, 104-105 [241 Cal.Rptr. 594, 744 P.2d 1127].) In addition, in this case the prosecutor was careful not to exploit the inapplicable factors or to suggest that the absence of a mitigating factor could be considered an aggravating circumstance (cf. *People* v. *Davenport* (1985) 41 Cal.3d 247, 288-290 [221 Cal.Rptr. 794, 710 P.2d 861]), properly informing the jurors in closing argument not to consider factors on which there was no evidence.

### L. EXPANDED REASONABLE DOUBT INSTRUCTION

Defendant contends that the trial court erred in failing to instruct the jury that the reasonable doubt standard applies to its determination whether aggravation outweighs mitigation and to its determination whether death is appropriate. We have rejected identical claims in numerous recent cases. (See, e.g., *People* v. *Rodriguez, supra*, 42 Cal.3d 730, 777-779; *People* v. *Bonin* (1989) 47 Cal.3d 808, 857 [254 Cal.Rptr. 298, 765 P.2d 460].)

### M. BROWN CLAIM

This case was tried before our decision in *People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440] (revd. on other grounds (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]), and the trial court instructed the jury, in conformity with the then-applicable provisions of CALJIC No. 8.84, that after considering the applicable aggravating and mitigating circumstances "[i]f you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without possibility of parole."

In *Brown, supra*, 40 Cal.3d 512, we recognized that this instruction—which tracked the language of section 190.3—was potentially confusing and could mislead the jury with respect to its determination of penalty in two separate respects. As we explained recently in *People* v. *Lang, supra*, 49 Cal.3d 991, 1033-1034: "One danger is that the jury might believe it could perform the weighing process in a mechanical fashion by comparing the number of factors in aggravation with the number in mitigation, or by the arbitrary assignment of weights to the factors. [Citation.] The other danger

is that the jury might fail to understand that our statutory scheme does not require any juror to vote for the death penalty unless, as a result of the weighing process, the juror personally determines that death is the appropriate penalty under all the circumstances."

Because of the potentially misleading nature of the instruction, we held in *Brown* that in cases tried after that decision the instruction should be modified to clarify the nature of the jury's sentencing function. (See *Brown, supra*, 40 Cal.3d at pp. 544-545, fns. 17, 19.) With respect to cases, like this one, which were tried before *Brown*, we indicated that we would examine the record to determine whether, in context, the jury may have been misled to defendant's prejudice about the scope of its sentencing discretion. (See *id*. at p. 544, fn. 17.)

In this case, it is clear from the record that the first potential danger posed by the instruction—that the jury would treat the process as a "mechanical" one—was not present. The trial court anticipated this aspect of *Brown, supra*, 40 Cal.3d 512, by specifically instructing the jury not to simply count the aggravating and mitigating circumstances but to weigh them.[23]

With respect to the second potential problem—the danger that the jurors would not understand that they should not return a death sentence unless they were persuaded that death rather than life without parole was the appropriate punishment under all the circumstances—the court gave a number of additional instructions that minimized the risk that the jurors would have misinterpreted the "shall" language of former CALJIC No. 8.84 as improperly restricting their sentencing discretion. First, the court instructed the jury that "[m]itigating factors are unlimited" and that "[a]nything mitigating should be considered and may be taken into account in deciding to impose a sentence of life without possibility of parole." Second, the court informed the jurors that they could assign whatever weight they wished to each factor, and that "any mitigating circumstance, standing alone, may be sufficient to support a decision that life without possibility of parole is an appropriate punishment, provided that the mitigating circumstance or circumstances outweigh[ ] any aggravating circumstance or circumstances." Finally, the court told the jury that "pity, sympathy or mercy for the defendant may be sufficient to justify a sentence of life without possibility of parole."

---

[23] The court instructed the jury in this regard: "In determining whether or not the mitigating . . . circumstances outweigh the aggravating circumstances, you must not simply count up the number of circumstances and decide whether there are more of one than of the other. Instead, you must weigh the various circumstances. The final test is in the relative weight of the circumstances, not the relative number."

Defendant contends that because the court qualified its instruction that "any mitigating circumstance may be sufficient to support a decision that life without possibility of parole is an appropriate punishment," by the clause "provided that the mitigating circumstance or circumstances outweigh[ ] any aggravating circumstance or circumstances," the jury was not left with the proper message that it did not have to return a death sentence unless it felt that death was the appropriate sentence under all the circumstances. From our review of the entire record, however, we conclude that the jury was not misled as to the nature of its sentencing task.

First, although the court's instructions may not have fully anticipated the *Brown* decision (*supra,* 40 Cal.3d 512), the instructions did make it clear to the jurors that they retained the authority to impose a sentence of life without possibility of parole if they concluded on the basis of "pity, sympathy or mercy" for the defendant that death was not the appropriate punishment. In light of this instruction, it is unlikely that a juror would have interpreted the instructions as a whole to require him or her to return a death verdict even if he or she did not personally believe that the death penalty was warranted under all the circumstances.

Furthermore, the prosecutor in his closing argument never suggested to the jurors that they were required to impose the death penalty without regard to their personal views as to the appropriateness of that penalty under the circumstances of this case. (Cf. *People* v. *Milner* (1988) 45 Cal.3d 227, 254-256 [246 Cal.Rptr. 713, 753 P.2d 669].) On the contrary, the prosecutor repeatedly told the jury "that there is one question for you to decide in this case and that is based upon what you have heard in this court, what penalty does this defendant deserve for what he did." Although at one point in his argument, before beginning his analysis of the aggravating and mitigating factors, the prosecutor did tell the jury that "[i]f the aggravation in this case outweighs the mitigation, as it would appear to by a significant margin, then your verdict should be a vote for death," he did not emphasize that formulation, but rather told the jury that "if you feel enough sympathy or pity or mercy, just based on those factors alone, just for the defendant, no misunderstanding about that . . . then you can spare his life, based on that." Towards the conclusion of his argument, the prosecutor asked the jurors to ask themselves: "Is this a person who, based on what I know about him, is a person who we should subject to the ultimate penalty we have at our disposal?" And then, he ended his argument by observing that "none of us likes to talk about it, but sometimes we find someone who deserves the worst penalty, the worst punishment we as a society can impose. [¶] And this is exactly that defendant, and this is exactly that case. And that's the penalty we're asking you to impose on him."

Viewing the record as a whole, we conclude that there is no reasonable basis for doubting that the jurors properly understood that their task at the penalty phase was to determine whether, under all the circumstances, death or life without possibility of parole was the appropriate penalty for defendant.

## V. Modification of Judgment Issue

### Consideration of Probation Report

■■■■ Although defendant has not raised any issue with regard to the trial court's denial of his application to modify the verdict pursuant to section 190.4, subdivision (e) (hereafter section 190.4(e)), our review of the record indicates that the trial court, in considering the application, erred in one significant respect. In ruling on the application, the trial court expressly stated that, in addition to considering the evidence that had been presented at the guilt and penalty phases and the argument of defense counsel, it had also "read and considered the probation report" that had been prepared at the conclusion of the penalty trial. As we explained in *People* v. *Williams* (1988) 45 Cal.3d 1268, 1329 [248 Cal.Rptr. 834, 756 P.2d 221], however, "[u]nder section 190.4(e), the court reviews the evidence presented to the jury—which, of course, does not include the probation report." (See also *People* v. *Adcox* (1988) 47 Cal.3d 207, 273-274 [253 Cal.Rptr. 55, 763 P.2d 906].)

Although the court erred in this regard, we conclude that in this case the error does not warrant the vacating of the judgment and a remand for a new ruling under section 190.4(e). While the probation report did refer to a number of incidents in defendant's juvenile record that had not been presented to the jury, and while the trial court, in denying the application for modification, briefly adverted to some of these incidents and to defendant's general failure to benefit from his interaction with the juvenile justice system, the court's comments as a whole indicate that, unlike the situation in *People* v. *Lewis, ante,* 262, 286-287 [266 Cal.Rptr. 834, 786 P.2d 892], those incidents did not play a significant role in the court's denial of the application. In articulating its reasons for denying the application, the court placed heaviest reliance on both the circumstances of the current offenses and defendant's past violent sexual misconduct, which the court felt "demonstrated [] past and present aggressive and violent tendencies towards females, which basically satisfies all sexual desires." The court also noted that defendant had been on parole both at the time he committed his receiving stolen property offense and when he committed the present offenses. After reviewing the various statutory factors, the court observed that, in its view, "it's unfortunately not close when you look at all the circumstances" in

aggravation and mitigation; indeed, the court indicated at one point that, in its view, the circumstances of the capital offense "just standing alone . . . outweigh the mitigating circumstances . . . . " Under these circumstances, we cannot say that there is a reasonable possibility that the court's improper consideration of the probation report affected its section 190.4(e) ruling. (See, e.g., *People* v. *Williams, supra,* 45 Cal.3d 1268, 1329-1330.)

## VI. DISPOSITION

The judgment is affirmed in all respects.

Lucas, C. J., Panelli, J., Eagleson, J., Kennard, J., and Arabian, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in the judgment as to guilt and death-eligibility. I agree with the majority that there was no reversible error bearing on those issues.

I dissent, however, from the judgment as to penalty. It is clear that the trial judge, in acting on defendant's application to modify pursuant to Penal Code section 190.4, subdivision (e), erred in reading and considering a probation report. (See, e.g., *People* v. *Lewis, ante,* 262, 287 [266 Cal.Rptr. 834, 786 P.2d 892].) It is also clear that the error was prejudicial. The information contained in the report was particularly damning in that it referred to a number of incidents in defendant's past that could reasonably be interpreted as indicating his inability to benefit from punishment and confinement.

In my view, the judgment of death must be vacated. I would not, however, order yet another hearing and thus give the trial judge a second opportunity to comply with the law. He now has sensitive information about defendant. Perhaps he could put it out of his mind and reflect only on the evidence presented to the jury. In an ordinary sentencing matter, the judge can be expected to be properly selective. But in the penalty phase of a capital case, in which the only issue is life or death, it may be far more difficult for the judge to disregard facts that are highly relevant but not properly before him.

Under these circumstances, I would exercise our authority under Penal Code sections 1260 and 1181, subdivision 7 (see, e.g., *People* v. *Adcox* (1988) 47 Cal.3d 207, 277 [253 Cal.Rptr. 55, 763 P.2d 906] (conc. and dis. opn. of Mosk, J.); *People* v. *Lucero* (1988) 44 Cal.3d 1006, 1034-1036 [245 Cal.Rptr. 185, 750 P.2d 1342] (conc. and dis. opn. of Mosk, J.)) and vacate

the judgment as to penalty and remand the cause to the trial court with directions to impose a sentence of life imprisonment without possibility of parole.

Appellant's petition for a rehearing was denied August 28, 1990.