Filed 7/6/15  In re Valentin R. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re VALENTIN R., a Person Coming Under the Juvenile Court Law.<br>_____<br><br>THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>VALENTIN R.,<br><br>      Defendant and Appellant. | B253437<br><br>(Los Angeles County<br>Super. Ct. No. FJ51530) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Christina L. Hill, Judge.  Affirmed as modified.

Laini Miller Melnick, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Analee J. Brodie, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant and appellant Valentin R. raises claims of insufficient evidence and improper probation conditions, following a contested Welfare and Institutions Code section 602 jurisdictional hearing in which he was found to have committed attempted robbery.

For the reasons discussed below, the judgment is affirmed as modified.

## BACKGROUND

Viewed in accordance with the usual rules of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *The People's evidence.*

On the night of June 30, 2013, at approximately 9:50 p.m., Jorge Mazariegos was walking down the street while talking on his cell phone. Valentin R. approached Mazariegos and said, "Hang up your cell phone" and "Give it to me." Valentin's words were slurred and he smelled of alcohol. When Valentin reached for the cell phone, Mazariegos held it out of reach and tried to hide it. Mazariegos was scared. Valentin asked if Mazariegos belonged to a gang and Mazariegos said no. Valentin said he wanted Mazariegos's money, his cell phone, and any drugs he might have. Valentin alternated between demanding these items and announcing the name of his gang, Mara Salvatrucha. Mazariegos testified that Valentin referred to Mara Salvatrucha "[a] lot, maybe ten" times.

Valentin asked Mazariegos if he had any marijuana and he repeatedly demanded Mazariegos's cell phone and money. He kept reaching for Mazariegos's phone and got mad when Mazariegos refused to give up his property. Valentin then punched Mazariegos. They exchanged a series of punches and Valentin fell down. Mazariegos tried to flee, but Valentin got up, came after him, and started fighting again. Valentin hit Mazariegos five or six more times before Mazariegos ran into his apartment building. Outside the apartment gate, Valentin "just threw up his hands and was saying his gang name and just started walking away."

Valentin was arrested approximately 30 to 40 minutes after Mazariegos identified him. Mazariegos told Los Angeles Police Officer Alex Ramirez that Valentin asked him,

2

"Where are you from?" When Mazariegos said he was not from any gang, Valentin replied, "This is Mara Salvatrucha Trece."

Officer Ramirez testified that when Valentin was detained "[h]e appeared to function, but you could also tell he was a bit intoxicated." Valentin's speech was not slurred and Ramirez had no trouble understanding him. Nevertheless, Ramirez decided not to take a statement from Valentin because it appeared his judgment was too impaired for him to give a knowing and voluntary *Miranda*[1] waiver. Valentin was wearing an unbuttoned shirt, displaying an "M.S." tattoo on his chest. He kept saying, "This is Mara Salvatrucha" and "Fuck the pigs." After Valentin vomited a number of times while in custody, he was taken to a hospital; he fell asleep during the ride in the patrol car and had to be awakened with smelling salts.

Los Angeles Police Detective Luz Bermudez testified as a gang expert. When asked a hypothetical question based on the evidence presented in this case, she opined that the attempted robbery of Mazariegos had been committed for the benefit of a criminal street gang and that it was consistent with the types of crimes committed by the Mara Salvatrucha gang. Displaying the gang tattoo on his chest and announcing his gang affiliation was the perpetrator's way of creating an atmosphere of intimidation "so the victim understands [that] if he retaliates [*sic*] there will be consequences."

2. *The juvenile's evidence.*

Valentin testified in his own defense. He acknowledged the "M.S." tattooed on his chest stood for Mara Salvatrucha, but said he only got the tattoo to impress girls and now he regrets it.

Valentin testified he began drinking around 5:30 p.m. on June 30, 2013. He initially drank two 40-ounce bottles of Mickey's brand liquor. An hour later he drank an eight-inch tall bottle of Taaka brand vodka. Later, he ran into some friends who had two 24-container packs of Corona beer, and he drank at least five beers with them. Valentin could not remember when he stopped drinking because "at some point at the last location

---

[1]     *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602].

when we were drinking the 24 pack, I started blacking out. All I knew was I was going to go hang out with some girls, and I don't even know if I got there. I don't know what happened next." He remembered bright lights shining in his face and having vomited several times at the police station. He recalled someone saying he should be taken to the hospital and then, at the hospital, that he was given pills and an intravenous drip.

Valentin testified he did not recognize Mazariegos. He had not intended to rob anyone or promote his gang that night; he did not even know why he had been arrested until he spoke to his attorney. Asked if he had been "gang-banging" that night, Valentin testified: "I don't remember." He testified "gang-banging" meant hanging out and having fun, i.e., doing just what he had been planning to do that night – "go out and have a few drinks and meet some girls."

Dr. John Wu, who worked at Olympia Medical Center, treated Valentin when he was brought to the hospital after vomiting at the police station. Valentin smelled of alcohol, his speech was slurred, and he could neither speak coherently nor stand. Dr. Wu diagnosed acute alcohol intoxication. Valentin was "very sleepy, very drowsy, very difficult to arouse," and he could not respond to questions. Dr. Wu had to awaken him with ammonia so he could be transported to a detention facility. Dr. Wu described Valentin's condition as falling "in and out of consciousness. I wouldn't say he was completely unconscious. He wasn't completely awake and alert . . . , but he was definitely what we call arousable." Dr. Wu also characterized Valentin as being "cognitively impaired" that night.

Theresa Rodriguez, who was employed at Central Juvenile Hall, observed Valentin on the morning of July 1, 2013, around 7:00 a.m. He was lying on the floor and vomiting repeatedly. He was moved to the infirmary about noon.

The parties stipulated that Mara Salvatrucha is a criminal street gang within the meaning of section 186.22, subdivision (b), the gang enhancement.

4

3. *Disposition.*

Having found that Valentin committed attempted robbery (Pen. Code, §§ 664, 211),[2] the juvenile court sustained the petition, declared Valentin a ward of the court, and ordered him to camp community placement for a period of nine months.

**CONTENTIONS**

Valentin contends: (1) there was insufficient evidence to sustain the juvenile court's finding that he committed attempted robbery; (2) there was insufficient evidence to sustain the gang enhancement finding; and (3) two of Valentin's conditions of probation are unconstitutionally vague.

**DISCUSSION**

1. *There was sufficient evidence of attempted robbery.*

Valentin contends there was insufficient evidence to sustain the juvenile court's finding he committed attempted robbery because his intoxication negated robbery's specific intent element. There is no merit to this claim.

a. *Legal principles.*

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence – that is, evidence that is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] ' "Although it is the duty of the [trier of fact] to acquit a defendant

---

**2** All further statutory references are to the Penal Code unless otherwise specified.

5

if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the [trier of fact], not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" ' [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

" 'The standard of proof in juvenile proceedings involving criminal acts is the same as the standard in adult criminal trials. [Citation.]' [Citation.] 'In considering the sufficiency of the evidence in a juvenile proceeding, the appellate court "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. We must presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence [citation] and we must make all reasonable inferences that support the finding of the juvenile court. [Citation.]" ' [Citation.]" (*In re Gary F.* (2014) 226 Cal.App.4th 1076, 1080.)

Attempted robbery consists of two elements: a specific intent to rob the victim, and the commission of a direct act aimed at accomplishing that robbery. (*People v. Watkins* (2012) 55 Cal.4th 999, 1020.) "Robbery is defined as the taking of personal property of some value, however slight, from a person or the person's immediate presence by means of force or fear, with the intent to permanently deprive the person of the property. [Citations.]" (*People v. Marshall* (1997) 15 Cal.4th 1, 34.)

Section 29.4, subdivision (b), provides in pertinent part that "[e]vidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent." However, "[a] defendant is entitled to [a voluntary intoxication] instruction only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's 'actual formation of specific intent.' " (*People v. Williams* (1997) 16 Cal.4th 635, 677; see

6

*People v. Seaton* (2001) 26 Cal.4th 598, 666 [defense counsel's failure to request intoxication instruction could not have been prejudicial because, although defendant smoked cocaine and drank gin, beer and wine before committing the offense, the evidence "did not strongly suggest [these intoxicating substances] prevented him from forming the intent to commit these crimes"]; *People v. Williams*, *supra*, at p. 678 [intoxication instruction unwarranted because there was "no evidence at all that voluntary intoxication had any effect on defendant's ability to formulate intent"]; *People v. Ramirez* (1990) 50 Cal.3d 1158, 1181 [intoxication instruction unwarranted where no evidence defendant's beer drinking "had any noticeable effect on his mental state or actions"].)[3]

        b. *Ruling below*.

During closing argument, the People's theory was that the evidence demonstrated Valentin clearly intended to permanently deprive Mazariegos of his property. Mazariegos testified Valentin had demanded his cell phone and his money, and then tried to take the phone by force, punching Mazariegos and setting off a fistfight. When Valentin fell to the ground, Mazariegos ran toward his apartment building, but Valentin got up, chased after Mazariegos, and attacked him again. Mazariegos managed to escape a second time from Valentin and flee into the building. In the end, Valentin apparently only gave up on his attempt to rob Mazariegos because he believed his intended victim was safely locked inside the apartment building.

The deputy district attorney argued, "This was not a haphazard drunken event. This was somebody who knew what he wanted, knew what he was going after, and took many operative steps to get those [items]." The deputy district attorney characterized Valentin's blackout testimony as unbelievable: "It was essentially a self-serving

---

**3**     Although jury instructions are not directly at issue in a juvenile case, we rely on jury instruction case law to the extent it explains why the evidence of Valentin's voluntary intoxication did not support a defense to the attempted robbery finding. (See, e.g., *In re Branden O.* (2009) 174 Cal.App.4th 637, 642 [juvenile court properly found minor committed assault with a stun gun because section 244.5 does not require "that a victim actually be immobilized, which is reflected in [CALCRIM No. 876,] a standard jury instruction for the offense."].)

narrative designed to elicit this intoxication defense. Very conveniently[,] he remembers all or at least parts of the evening but for this alleged event and the time span [*sic*]." The deputy district attorney also disputed the credibility of Valentin's assertion that gang membership had nothing to do with his encounter with Mazariegos: "[I]t's simply ludicrous to suggest that someone would get a chest-wide gang tattoo solely to impress and flirt with girls. And even more ridiculous to say that a gang, especially one as infamous as M.S. 13, is based solely around hanging out and having fun with friends rather than criminal activity."

In response, defense counsel argued Valentin's testimony demonstrated that he "didn't have any intention to steal that night," because he said, "I didn't go out for that purpose. I was going to go out and hang out with my friends and meet some girls, hopefully, and drink. But . . . my intention was not to steal from anyone and most certainly not to try to make them feel scared or use my gang or what have you. None of the evidence suggests that that was the intention."

The juvenile court, however, agreed with the People and said to the public defender: "[Y]our client testified he has no memory of anything that happened between the time that he drank the Coronas and when he saw the lights when he was in Olympic Medical Center. [¶] Well, it seems a little odd that he would be able to remember with great specificity two 40 ounce, and he did add that the brand was Mickeys, and then he was very clear on the type of vodka that he drank, the Taaka Vodka . . . and he showed us . . . that it was approximately an 8 inch tall bottle. [¶] Then he specifically remembers running into two friends who had two 24 packs of Coronas, and he has a specific recollection that he drank at least five beers. [¶] And I will agree with you 100 percent that that is a whole lot of alcohol for anybody. But why is it that the gap of time just happens to be when the offense occurred? It seems, frankly, very self-serving to me." The juvenile court concluded: "There is no testimony other than Mr. Mazariegos's and your client[']s, except he doesn't remember the attempted robbery, so really the only testimony that we have about what happened during this event is from the victim. And I

8

can't think of any reason to make the court not take Mr. Mazariegos's testimony as being credible and true.  I find that he was extremely credible."

        c.  *Discussion*.

We agree with Valentin there was sufficient evidence that he was quite intoxicated when he accosted Mazariegos on the street.  However, this evidence was not sufficient, by itself, to negate a finding Valentin had the specific intent to permanently deprive Mazariegos of his property because "there was no evidence at all that voluntary intoxication had any effect on [Valentin's] ability to formulate intent."  (*People v. Williams*, *supra*, 16 Cal.4th at pp. 677-678.)  For example, in *People v. Smith* (1968) 259 Cal.App.2d 868, 870, the defendant testified that, at the time of an alleged burglary, he was intoxicated from having consumed three or four bottles of wine along with some whiskey and vodka.  Nevertheless, the Court of Appeal concluded "[t]here was . . . ample evidence from which the trier of fact could question Smith's testimony as to his state of intoxication and find that Smith in fact did have the requisite specific intent to commit a larceny" when he entered a liquor store that was being used primarily as a warehouse.  (*Id*. at p. 872.)  The evidence was that Smith and his accomplices "approached the front of the liquor store, peered through the window into the premises, and walked around to an alley running along the rear of the store.  Then one defendant was seen pushing a rear window open.  Defendants Smith and White entered the building, and Wright maintained a lookout outside.  Smith was found hiding in a box inside the burglarized premises." (*Id*. at p. 871.)  When found, Smith had in his possession brands of alcohol distributed exclusively by the owner of the liquor store.  This evidence demonstrated that, despite being intoxicated, Smith formed the requisite specific intent.

Valentin argues the evidence at his trial demonstrated he was too intoxicated to form the intent to commit robbery because Mazariegos testified Valentin not only slurred his words and smelled of alcohol, but that he "fell down as if he were dizzy" and "had difficulty getting up when he fell."  Valentin neglects to mention, however, that he fell down *after* he was punched numerous times by Mazariegos.  The juvenile court could

9

have reasonably concluded Valentin fell down and had trouble getting back up because of the fist fight, not just because he had been drinking.

Valentin argues the juvenile court "erroneously focused on the credibility of a witness [i.e., Mazariegos] whose credibility was not at issue." Not so. To successfully raise a voluntary intoxication defense, there had to be evidence not just that Valentin was intoxicated but that this prevented him from actually forming the specific intent to commit robbery. The juvenile court's point was that there were only two witnesses to what happened; it found Mazariegos credible, and it found Valentin – who testified he could not remember anything about the incident, but nevertheless *knew* he did not intend to rob anyone that night – not to be credible. According to Mazariegos, Valentin demanded his property, threatened him by announcing his affiliation with a notoriously violent gang, and physically attacked him when the property was not turned over. After Mazariegos successfully defended himself and ran away, Valentin caught up with him and attacked him a second time. Valentin ultimately gave up only after Mazariegos fled into his apartment building and secured himself behind what Valentin apparently believed was a locked door. These acts demonstrate that, as drunk as Valentin may have been, he still intended to rob Mazariegos.

We conclude there was sufficient evidence to sustain the juvenile court's finding that Valentin intended to commit robbery.

2. *There was sufficient evidence to sustain the gang enhancement finding.*

Valentin contends the gang enhancement finding must be reversed because there was insufficient evidence he had the specific intent to promote, further, and assist the criminal conduct of gang members. There is no merit to this claim.

The gang expert, Officer Luz Bermudez, testified in answer to a hypothetical question that "if a gang member . . . prior to committing a crime states or asks a victim, where are you from, and then says Mara Salvatrucha Trece as he is committing a crime, it is for the benefit and in the name of and for the benefit and furtherance of a street gang." On cross-examination, Bermudez was asked if her answer to this hypothetical question

10

would be different if she assumed the gang member "was intoxicated and had gone on an alcohol binge prior to the commission of [the] act." Bermudez answered no.

Citing *People v. Killebrew* (2002) 103 Cal.App.4th 644 (*Killebrew*), Valentin argues Bermudez's testimony was improper as it "did nothing more than inform the court how the case should be decided" and, because a defendant's mere gang affiliation or criminal history "cannot alone support a finding that a crime is gang-related," there was insufficient evidence to sustain the gang enhancement finding.

Valentin's reliance on *Killebrew* is misplaced. "A gang expert may render an opinion that facts assumed to be true in a hypothetical question present a 'classic' example of gang-related activity, so long as the hypothetical is rooted in facts shown by the evidence. [Citation.]" (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1551, fn. 4.) This is true even if the gang expert's opinion in effect answers an ultimate issue in the case. Any "reliance on *Killebrew* for a contrary conclusion is misplaced. In *Killebrew*, in response to hypothetical questions, the People's gang expert exceeded the permissible scope of expert testimony by opining on 'the subjective *knowledge and intent* of each' of the gang members involved in the crime. [Citation.] Specifically, he testified that each of the individuals in a caravan of three cars knew there was a gun in the Chevrolet and a gun in the Mazda and jointly possessed the gun with everyone else in the three cars for mutual protection. [Citation.] *Killebrew* does not preclude the prosecution from eliciting expert testimony to provide the jury with information from which the jury may infer the motive for a crime or the perpetrator's intent; *Killebrew* prohibits an expert from testifying to his or her opinion of the knowledge or intent of a defendant on trial." (*Id.* at pp. 1550-1551.) As our Supreme Court has noted: "Obviously, there is a difference between testifying about specific persons and about hypothetical persons. It would be incorrect to read *Killebrew* as barring the questioning of expert witnesses through the use of hypothetical questions regarding hypothetical persons. . . . [U]se of

11

hypothetical questions is proper." (*People v. Gonzalez* (2006) 38 Cal.4th 932, 946, fn. 3.)[4]

The crucial point is the difference between testifying about the particular defendant's mental state rather than the mental state of gang members in general. Here, Bermudez was asked and answered a detailed hypothetical question based on the facts of this case; she was then asked whether altering one of the hypothetical facts would cause her to change her opinion. All of this testimony properly supported the gang enhancement finding.

We conclude there was sufficient evidence to sustain the gang enhancement finding.

3. *Vague probation conditions must be corrected.*

Valentin contends two of his probation conditions – that he maintain "good" behavior and "satisfactory" school grades – are unconstitutionally vague. This claim has merit. We will modify the latter condition and strike the former.

a. *Legal principles.*

The concern underlying the void for vagueness doctrine is the due process requirement of adequate notice. "A probation condition 'must be sufficiently precise for the probationer to know what is required of him, and for the court to determine whether the condition has been violated,' if it is to withstand a challenge on the ground of vagueness. [Citation.]" (*In re Sheena K.* (2007) 40 Cal.4th 875, 890.) "The rule of fair warning consists of 'the due process concepts of preventing arbitrary law enforcement and providing adequate notice to potential offenders' [citation], protections that are 'embodied in the due process clauses of the federal and California Constitutions. (U.S. Const., Amends. V, XIV; Cal. Const., art. I, § 7.)' [Citation.] The vagueness doctrine

---

[4]      Valentin also cites *In re Frank S.* (2006) 141 Cal.App.4th 1192, but that case was decided by the same Court of Appeal that decided *Killebrew*. *Frank S.* rejected an expert opinion because, "[s]imilar to *Killebrew*, the expert . . . testified to 'subjective knowledge and intent' *of the minor*. [Citation.] 'Such testimony is much different from the expectations of gang members in general when confronted with a specific action.' " (*Id*. at pp. 1197-1198, italics added and deleted.)

12

bars enforcement of ' "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." [Citation.]' [Citation.]" (*Ibid.*)

*In re Sheena K.* held that a probation condition forbidding the minor's association with "anyone disapproved of by probation" was unconstitutional unless modified to include an explicit knowledge requirement. The appellate court properly clarified the condition by "inserting the qualification that defendant have *knowledge* of who was disapproved of by her probation officer." (*In re Sheena K.*, *supra*, 40 Cal.4th at p. 892, italics added; see also *People v. Garcia* (1993) 19 Cal.App.4th 97, 102 [probation condition requiring defendant to refrain from associating with users and sellers of narcotics was "not sufficiently narrowly drawn because it limits appellant's association with persons not known to him to be users and sellers of narcotics"].)

    b. *Discussion.*

Valentin's probation condition number 9 states: "You must go to school every day. You must be on time to each class. You must have good behavior at school. You must receive satisfactory grades." Valentin argues this condition is unconstitutional "because it does not adequately inform the minor of what constitutes 'good' behavior or of what grades would be considered to be 'satisfactory.' "

    (1)  *"Satisfactory grades" means "passing grades."*

"School attendance has regularly been upheld as a condition of probation reasonably related to rehabilitation and prevention of future criminality. [Citations.] This is so, not because school attendance keeps juveniles off the streets – commitment to juvenile hall would accomplish this purpose more effectively – but because of the well known correlation between education and the crime rate. [Citation.] Presumably, mere attendance at school without learning accomplishes little." (*In re Robert M.* (1985) 163 Cal.App.3d 812, 815-816.)

Valentin argues the condition that he receive "satisfactory grades" is unconstitutionally vague because the word "satisfactory" is too imprecise. Valentin acknowledges that *In re Angel J.* (1992) 9 Cal.App.4th 1096, 1099 (*Angel J.*), construed

13

the phrase "satisfactory grades" to mean "passing grade[s]" in order to dispel any unconstitutional vagueness, but he argues the condition should nevertheless be stricken "because there is no information in the record to suggest that [he] would be able to satisfy the condition at present." Valentin asserts the record demonstrates he "was 16 years old at the time of the offense. The probation report states that he was in 11th grade . . . but not attending. A second report states not only that he was not attending but that he was not enrolled. . . . [¶] The only school transcripts in the record are for 8th and 9th grades . . . . [which indicate he] received only Cs and Ds in his classes, except for P.E. where he received Bs."

We are not persuaded that the record demonstrates Valentin is unable to attain passing grades. Contrary to Valentin's assertion, the school transcripts do not indicate he received "only" C's and D's. The transcripts show he received B's in the following courses: High School Health, Modern World History, and Life Science. To be in the 11th grade at 16 years old is not unusual. Earning mostly C's and D's – but no F's – in his academic classes, which is what Valentin has been managing, is no more than what this probation condition requires as glossed by case law. (Compare *In re Robert M.*, *supra*, 163 Cal.App.3d at pp. 816-817 ["[W]e strike the 'satisfactory grades and citizenship' requirement from the conditions on Robert's probation because the uncontradicted evidence shows compliance with that condition is beyond Robert's capacity. Here we have a 13-year-old boy attending seventh grade with second grade vocabulary skills, third grade reading skills and third grade math skills. He has an I.Q. of 70. A court-ordered evaluation concluded Robert 'is functioning about five years below his current grade level in all academic areas.' "] with *In re Angel J.*, *supra*, 9 Cal.App.4th at p. 1102, fn. omitted ["Unlike *Robert M*. . . . here Angel recently received passing grades in all subjects except physical education. [Citation.] Given the definition of satisfactory grades noted above, Angel has demonstrated the capability to fulfill the probation requirement. . . . There is no evidence to support the contention that Angel is unable to achieve a D or above in all subjects, including physical education."]; see also *In re Juan G.* (2003) 112 Cal.App.4th 1, 7-8 [because record showed juvenile lacked ability

14

to maintain B average, he would just be required to maintain "satisfactory grades" as defined by *Angel J.*].)

To resolve the constitutional issue, we find that a "satisfactory grade" means a "passing grade," i.e., a grade that is not failing. As so modified, this probation condition is valid.

(2)  *"Good behavior" at school is too vague*.

The Attorney General argues the probation condition requiring Valentin to have "good behavior at school" is not unconstitutionally vague because "every minor knows what 'good' behavior means. It means that appellant should not violate the rules of the school. What those rules might be, and how appellant might violate them, cannot be conclusively determined in advance." To reinforce this argument, the Attorney General adds: "Another term of appellant's probation made the point even more clearly, requiring him to 'obey all the rules of your mother, teachers, [and] school officials.' "

In reply, Valentin argues: "The question becomes what the minor must do to be good, in addition to going to school every day, being on time, and obeying the school rules. If these three things constitute 'good' behavior, then the additional and vague requirement of 'good' behavior is surplusage. It should either be stricken or modified to be clear that what is required is compliance with school rules."

We agree with Valentin that reasonable minds can differ as to what the term "good behavior" means. Moreover, Valentin's probation condition number 2 already requires him to "obey the rules of your Parents, Caregivers, Teachers, School Officials, and Children's Services Workers." Given the vagueness of the "good behavior" requirement in probation condition number 9, and its apparent redundancy with the language in probation condition number 2, we will strike the "good behavior" language.

15

## DISPOSITION

The judgment is affirmed as modified.  The attempted robbery and gang enhancement findings are affirmed.  Probation condition number 9 is hereby modified by striking the "good behavior" term.  The phrase "satisfactory school grades" in probation condition number 9 shall be defined as "passing school grades."

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EDMON, P. J.


We concur:



ALDRICH, J.



EGERTON, J.[*]

---

[*]      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

16