Filed 8/17/17

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EDWARD BENJAMIN BUTTON,<br><br>    Defendant and Appellant. | D070341<br><br><br><br>(Super. Ct. No. SCN337266) |

APPEAL from a judgment of the Superior Court of San Diego County,
Harry M. Elias, Judge.  Affirmed.

Allison L. Ehlert, under appointment by the Court of Appeal, for Defendant and
Appellant.

Kathleen A. Kenealy, Acting Attorney General, Gerald A. Engler, Chief Assistant
Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and
Christine Yoon Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*]    Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for
publication with the exception of part III.A.

I.

INTRODUCTION

A jury found Edward Benjamin Button guilty of one count of corporal injury to a spouse or roommate (Pen. Code, § 273.5, subd. (a))[1] (count 1), and one count of assault by means likely to produce great bodily injury (§ 245, subd. (a)(4)) (count 2). With respect to both counts, the jury found true the allegation that Button personally inflicted great bodily injury upon the victim (§ 1192.7, subd. (c)(8)).[2] The trial court imposed a sentence of 240 days in the custody of the Sheriff, stayed execution of the portion of the sentence that Button had not yet served (220 days), and placed Button on formal probation for three years.

On appeal, Button claims that the People failed to present sufficient evidence that he was not acting in self-defense when he punched the victim in the face, breaking her nose and causing her to suffer a concussion. In the unpublished portion of this opinion, we conclude that there is plainly evidence upon which the jury could have reasonably found that Button did not act in self-defense.

Button also claims that the jury's true findings on the serious felony allegations (§ 1192.7, subd. (c)(8)) must be reversed because the findings are premised on an invalid stipulation entered into between the People and the defense pursuant to which Button

---

[1] Unless otherwise specified, all subsequent statutory references are to the Penal Code.

[2] Section 1192.7, subdivision (c) defines "serious felony" as including "any felony in which the defendant personally inflicts great bodily injury on any person, other than an accomplice." (§ 1192.7, subd. (c)(8).)

effectively admitted the truth of the allegations.  Button contends that the stipulation is invalid because the trial court failed to admonish him pursuant to *Boykin-Tahl*[3] and their progeny with respect to the constitutional rights that he was foregoing by entering into the stipulation, and also failed to advise him of the penal consequences of the stipulation. We conclude that the trial court was not required to provide the admonishments because the stipulation did " 'not have the definite penal consequences necessary to trigger the *Boykin-Tahl* requirements.' "  (*People v. Cross* (2015) 61 Cal.4th 164, 171 (*Cross*).) Accordingly, we affirm the judgment.[4]

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *The People's evidence*

1.  *Button punches the victim in the face twice*

At the time of the charged offenses, Button and the victim,[5] B.D., were students at Palomar College.  They had been in a dating relationship for approximately a year and a

---

[3]    (*Boykin v. Alabama* (1969) 395 U.S. 238 (*Boykin*); *In re Tahl* (1969) 1 Cal.3d 122 (*Tahl*).)

[4]    Button also filed a petition for habeas corpus (*In re Button*, D071889) that we deny by way of a separate order filed today.

[5]    As of January 1, 2017, California Rules of Court, rule 8.90 (Rule 8.90) became effective.  Rule 8.90, subdivision (b) requires appellate courts to "consider referring to" certain individuals "by first name and last initial or, if the first name is unusual or other circumstances would defeat the objective of anonymity, by initials only," in order to protect those individuals' privacy.  The list of people to whom this rule applies includes victims of crimes.  (Rule 8.90(b)(4).)  After consideration, we have decided to refer to the victim in this case by her initials, in order to try to provide the victim with some measure of anonymity.

3

half and had previously been engaged.  Their engagement ended a couple of weeks prior to the incident giving rise to the charged offenses.

Although their engagement had ended, on the day before the incident, Button and B.D. had sexual intercourse.  According to B.D., Button told B.D. that they could continue to be "lovers" if she would agree not to reveal the nature of their relationship to anyone.

The next day, B.D. and Button had a class together.  During class, B.D. learned that a group of Button's friends were going to a restaurant after class.  One of the friends invited B.D. to come along.  While B.D. was gathering her belongings after class, everyone left without her.  Shortly thereafter, B.D. called Button a couple of times and sent him some text messages.  She received no immediate response.

Later that day, B.D. received a call from Button.  B.D. asked Button to meet her so that they could talk.  They agreed to meet in front of a building on campus.  When Button arrived to the meeting, he appeared to be very upset.  His hands were clenched and his face and voice conveyed anger.  Button accused B.D. of telling two of his friends that they were still dating.  B.D. denied the accusation, and Button called her a liar.

B.D. took off her glasses because she was crying.  She then stepped forward with her arms open in order to give Button a hug.  Button grabbed both of B.D.'s biceps and began squeezing her.  B.D. was shocked and struggled to get free.  Once B.D. escaped Button's grasp, she slapped Button across the face with an open hand.

4

Button immediately punched B.D. in the face, twice. B.D.'s hands were at her sides at the time Button punched her. B.D. bent over and blood rushed into her mouth. Immediately after the incident, the two walked to a health services office on campus.

2. *Button's statement to police*

Officer Stephen Wilson, a police officer at the college, responded to the health services office. According to Officer Wilson, immediately upon seeing Officer Wilson, Button said, "I know, I know, I did it, I punched her, you might as well arrest me now." Button held his arms out and gestured as if he wanted Officer Wilson to handcuff him.

Button told Officer Wilson that when he met B.D. in front of the building where the incident took place, he was upset that B.D. was telling people that they were still together. Button also admitted to starting the fight by grabbing B.D.'s arm.[6] According to Button, after grabbing B.D.'s arm, B.D. slapped him on the side of the face, and he punched her. Button told Officer Wilson that he knew he was wrong for punching B.D. and that he knew he was going to go to jail. At no time during their conversation did Button say that he had acted in self-defense.

3. *B.D.'s injuries*

B.D. suffered a concussion as a result of the blows to her face. In addition, B.D. suffered three acute fractures of her facial bones—a hairline fracture through her left

---

[6]     At trial, B.D. testified that Button grabbed both of her arms.

nasal bone and two additional fractures through the frontal process of the maxillary bones.[7] B.D. eventually underwent surgery in order to treat the injuries.

B. *The defense*

Three students who had been at the lunch with Button and who witnessed the incident from a considerable distance, testified. The witnesses stated that B.D. struck Button first, and that Button then struck B.D.

III.

DISCUSSION

A. *There is sufficient evidence to support the jury's implicit finding that Button did not act in self-defense*

Button claims that there is insufficient evidence to support the jury's implicit finding that he was not acting in self-defense when he punched B.D. in the face.

1. *Governing law*

a. *The law governing challenges to the sufficiency of the evidence*

In determining the sufficiency of the evidence to support a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.) "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is

---

7 The jury was told that the frontal process of the maxillary bones are "the most posterior or deepest part of the nasal bones where they connect with the maxillary sinuses."

reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)

### b. *Relevant law pertaining to self-defense*

In order to act in lawful self-defense, a defendant must have "reasonably believed he was in imminent danger of violence, reasonably believed the immediate use of force was necessary to defend himself, and used no more force than was reasonably necessary to defend against the threat." (*People v. Hernandez* (2011) 51 Cal.4th 733, 747.) "[T]he People have the burden to prove beyond a reasonable doubt that the defendant did not act in self-defense" in order to prove that the defendant is guilty of the charged offenses. (*People v. Lee* (2005) 131 Cal.App.4th 1413, 1429.)

### 2. *Application*

In finding Button guilty of the charged offenses, and thereby implicitly finding that Button did not act in lawful self-defense, the jury could have reasonably relied on evidence that Button was angry at the outset of the incident, that he instigated a physical confrontation with the victim, that he punched the victim twice in the face with sufficient force to cause three fractures and a concussion, and that he told a responding officer that he was guilty and should go to jail. (See pt. II.A, *ante*.) Evidence that Button was angry, instigated a physical confrontation, and made statements evincing a consciousness of guilt shortly after the incident all support a finding that Button did not punch B.D. because he "reasonably believed the immediate use of force was necessary to defend himself." (*Hernandez*, *supra*, 51 Cal.4th at p. 747.) Evidence that Button punched B.D.

7

twice in the face with sufficient force to cause three broken bones and a concussion (see pt. II.A, *ante*) supports a finding that Button acted with more force than was reasonably necessary to defend against B.D.'s open hand slap. (See *ibid.*)

Button's arguments to the contrary are not persuasive. Button argues that evidence that he "immediately" punched B.D. in response to her slap "suggest[s] that he was trying to protect himself against any further aggression on B[.D.]'s part." While the jury *might* have found that Button's punches were an attempt to prevent further aggression from B.D., the jury also could have reasonably found that Button punched B.D. out of anger rather than a reasonable belief in the need to defend himself.

Button also argues that "the amount of force . . . was not unreasonable under the circumstances," noting that there was evidence that B.D. outweighed Button by 120 pounds. In support of this contention, Button argues that in determining whether a defendant acted in lawful self-defense, the question is "not whether the force used appears excessive in hindsight but whether it appeared reasonably necessary to avert threatened harm under the circumstances at the time." (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1057.) We agree with the *Ross* court's observation. However, as the *Ross* court also stated, the question of whether a defendant used excessive force is ordinarily "a question entrusted to the jury." (*Ibid.*) In this case, despite evidence that B.D. weighed considerably more than Button, a reasonably jury could have found that Button's two forceful punches were excessive, given evidence that B.D. had slapped Button only once with an open hand and had her arms down at her sides at the time Button punched her.

8

Accordingly, we conclude that there is sufficient evidence to support the jury's implicit finding that Button did not act in self-defense.

B. *The trial court was not required to admonish Button pursuant to* Boykin-Tahl *and their progeny prior to accepting the parties' stipulation that Button personally inflicted great bodily injury on B.D.*

Button claims that the trial court erred in failing to admonish him pursuant to *Boykin-Tahl* and their progeny prior to accepting the parties' stipulation that Button personally inflicted great bodily injury on B.D.

1. *Factual and procedural background*

The amended information in this case alleged, with respect to both counts 1 and 2, that Button "personally inflicted great bodily injury upon [B.D.], not an accomplice to the above offense, within the meaning of . . . section 1192.7, [subdivision] (c)(8)." During the trial, the following colloquy occurred:

> "[The prosecutor]: [I]t is stipulated between the parties that the defendant Edward Benjamin Button personally inflicted great bodily injury upon [B.D.] within the meaning of Penal Code section 1192.7[, subdivision] (c)(8) as to counts one and two.
>
> "The court: So stipulated?
>
> "[Defense counsel]: So stipulated.
>
> "[The prosecutor]: So stipulated."

Immediately thereafter, the court instructed the jury that it was "to take all of those facts as contained in [the stipulation] as having been conclusively proved."

The jury found Button guilty of both charged offenses and, with respect to both offenses, found true that "in the commission of the . . . offense, [Button] personally

9

inflicted great bodily injury upon [B.D.], within the meaning of . . . section 1192.7[,

subdivision] (c)(8)."

## 2. *Governing law*

### a. Boykin-Tahl *and their progeny*

In *Cross*, the California Supreme Court summarized well established law

governing admonishments that a trial court must provide and the waivers that a court

must obtain before accepting a guilty plea to a charged offense:

> "When a criminal defendant enters a guilty plea, the trial court is
> required to ensure that the plea is knowing and voluntary.  (See
> *Boykin*[, *supra*,] 395 U.S. [at pp.] 243–244. . . .)  As a prophylactic
> measure, the court must inform the defendant of three constitutional
> rights—the privilege against compulsory self-incrimination, the right
> to trial by jury, and the right to confront one's accusers—and solicit
> a personal waiver of each.  ([Citation]; see *Boykin*, at pp. 243–244;
> *In re Tahl*[, *supra*,] 1 Cal.3d [at pp.] 130–133. . . .)  Proper
> advisement and waiver of these rights, conducted with 'the utmost
> solicitude of which courts are capable,' are necessary 'to make sure
> [the accused] has a full understanding of what the plea connotes and
> of its consequence.'  (*Boykin*, at pp. 243–244.)"  (*Cross*, *supra*, 61
> Cal.4th at p. 170.)

The *Cross* court explained that in *In re Yurko* (1974) 10 Cal.3d 857 (*Yurko*), the

California Supreme Court held that *Boykin-Tahl*'s requirements apply when a defendant

"admits the truth of a prior conviction allegation that subjects him to increased

punishment." (*Cross*, *supra*, 61 Cal.4th at p. 170.)  The *Cross* court explained the

rationale of *Yurko* as follows:

> "We explained [in *Yurko*]: 'Because of the significant rights at stake
> in obtaining an admission of the truth of alleged prior convictions,
> which rights are often of the same magnitude as in the case of a plea
> of guilty, courts must exercise a comparable solicitude in extracting
> an admission of the truth of alleged prior convictions. . . .  As an

10

accused is entitled to a trial on the factual issues raised by a denial of the allegation of prior convictions, an admission of the truth of the allegation necessitates a waiver of the same constitutional rights as in the case of a plea of guilty.  The lack of advice of the waivers so to be made, insofar as the record fails to demonstrate otherwise, compels a determination that the waiver was not knowingly and intelligently made.' [Citation.]  We concluded that '*Boykin* and *Tahl* require, before a court accepts an accused's admission that he has suffered prior felony convictions, express and specific admonitions as to the constitutional rights waived by an admission.  The accused must be told that an admission of the truth of an allegation of prior convictions waives, as to the finding that he has indeed suffered such convictions, the same constitutional rights waived as to a finding of guilt in case of a guilty plea.' "  (*Ibid.*)

The *Cross* court also explained that *Boykin-Tahl* requirements do not apply in certain circumstances:

"[O]ur case law since *Yurko* has drawn a distinction between, on one hand, 'a defendant's admission of evidentiary facts which [does] not admit every element necessary to conviction of an offense or to imposition of punishment on a charged enhancement' and, on the other, 'an admission of guilt of a criminal charge or of the truth of an enhancing allegation where nothing more [is] prerequisite to imposition of punishment except conviction of the underlying offense.' (*People v. Adams* (1993) 6 Cal.4th 570, 577 (*Adams*).) The requirements of *Boykin-Tahl* and *Yurko* apply to the latter type of admission but not the former.  [Citation.]  [¶]  In *Adams,* for example, we held that a mere stipulation to being on bail 'does not admit the truth of . . . every fact necessary to imposition' of additional punishment under section 12022.1 and therefore 'does not have the definite penal consequences necessary to trigger the *Boykin-Tahl* requirements.' "  (*Cross, supra*, 61 Cal.4th at p. 171.)

Thus, "*Boykin-Tahl* requirements do not apply to a stipulation of 'evidentiary facts, even facts crucial to a conviction,' if the stipulation does not encompass 'all of the evidentiary facts necessary to imposition of the additional penalty.' "  (*Cross*, *supra*, 61 Cal.4th at p. 171.)

11

Applying this law to the facts in *Cross*, the Supreme Court concluded that a stipulation pursuant to which the defendant admitted that he had suffered a prior conviction that "*authorized* the trial court to impose a greater punishment on [the defendant] if the jury found that he was guilty of the charged offense" (italics added), required *Boykin-Tahl* warnings. (*Cross*, *supra*, 61 Cal.4th at p. 174.)[8] The *Cross* court reasoned in part:

> "In *Adams*, we said that a stipulation has 'definite penal consequences' if it establishes 'every fact necessary' to support an 'additional punishment.' (*Adams*, *supra*, 6 Cal.4th at pp. 578, 580; [citation].) A stipulation may establish every fact necessary to support an increased punishment even if the trial court decides not to impose that punishment. Thus, our cases suggest that the phrase 'definite penal consequences' means definite *exposure* to additional punishment. Because the stipulation here established every fact necessary to expose Cross to a penalty beyond the four-year maximum term available . . . , it resulted in a definite penal consequence. '[N]othing more was prerequisite to imposition of [the elevated] punishment except conviction of the underlying offense . . . .' (*Adams*, at p. 577.)" (*Id.* at p. 175.)

b. *The law governing serious felony allegations*

Section 1192.7, subdivision (c) contains a list of serious felonies[9] and provides in relevant part:

---

[8]      The *Cross* court explained that, pursuant to the statutory scheme at issue, "Cross's prior conviction exposed him to a prison term of two, four, or five years instead of two, three, or four years," and that "[t]he trial court sentenced Cross to the maximum term of five years." (*Cross*, *supra*, 61 Cal.4th at p. 168.)

[9]      "While most of the categories of serious felonies set forth in subdivision (c) are based on defined offenses, subdivision (c)(8) . . . include[s] as [a] serious felon[y] 'any' felony in which the defendant 'personally inflicts great bodily injury' on a nonaccomplice . . . . (Pen. Code, § 1192.7, subd. (c)[(8)].) Thus, while a robbery, rape or murder conviction is ipso facto a serious felony conviction, a conviction for an offense

12

"As used in this section, 'serious felony' means any of the following: . . . (8) any felony in which the defendant personally inflicts great bodily injury on any person, other than an accomplice . . . ."

The Three Strikes law (§§ 667, subd. (b)–(i), 1170.12, subd. (b)) provides for enhanced penalties for those previously convicted of a serious felony (§§ 667, subd. (e), 1170.12, subd. (c)), and defines serious felony by reference to section 1192.7, subdivision (c). (See §§ 667, subd. (d), 1170.12, subd. (b) ["Notwithstanding any other provision of law . . . a prior serious . . . conviction of a felony shall be defined as: (1) . . . [A]ny offense defined in subdivision (c) of Section 1192.7 as a serious felony in this state"].)

Section 969f states:

"(a) Whenever a defendant has committed a serious felony as defined in subdivision (c) of Section 1192.7, the facts that make the crime constitute a serious felony may be charged in the accusatory pleading. However, the crime shall not be referred to as a serious felony nor shall the jury be informed that the crime is defined as a serious felony. This charge, if made, shall be added to and be a part of the count or each of the counts of the accusatory pleading which charged the offense. If the defendant pleads not guilty to the offense charged in any count which alleges that the defendant committed a serious felony, the question whether or not the defendant committed a serious felony as alleged shall be tried by the court or jury which tries the issue upon the plea of not guilty. If the defendant pleads guilty of the offense charged, the question whether or not the defendant committed a serious felony as alleged shall be separately admitted or denied by the defendant."

---

which does not fall within any of the subsections of subdivision (c) other than subdivision (c)(8) . . . is not a serious felony conviction unless it can be established that the offender . . . personally inflicted great bodily injury on a non-accomplice in the commission of the offense." (*People v. Yarbrough* (1997) 57 Cal.App.4th 469, 474 (*Yarbrough*).)

"[T]he legislative history of section 969f shows that it was enacted in order to prequalify a crime as a serious felony in the event of a defendant's future conviction of another serious felony." (*People v. Leslie* (1996) 47 Cal.App.4th 198, 204 (*Leslie*); see also *Yarbrough*, *supra*, 57 Cal.App.4th at p. 477 ["The legislative history of Penal Code section 969f demonstrates that it was intended to identify serious felony offenses for the sole purpose of enhancing *future* convictions"].)

3. *Application*

The parties have not cited, and our own independent research has not uncovered, any case law extending the requirements of *Boykin-Tahl* to a stipulation that has the effect of "prequalify[ing] a crime as a serious felony in the event of a defendant's future conviction of another serious felony." (*Leslie*, *supra*, 47 Cal.App.4th at p. 204.) In *Cross*, the California Supreme Court stated that a stipulation must have " '*definite* penal consequences . . . to trigger the *Boykin-Tahl* requirements.' " (*Cross*, *supra*, 61 Cal.4th at p. 171, italics added.) Button does not dispute that the true findings on the serious felony allegations premised upon the parties' stipulation had *no* penal consequences in this case. However, he notes that"[b]ecause the true findings on the [serious felony] allegations renders [Button's] conviction a strike offense, he now faces the risk of a significantly enhanced punishment in a *future* prosecution — no less than the doubling of his term of imprisonment on a future felony conviction." (Italics added.) Button contends that "there is no principled reason why a court should be required to give *Boykin-Tahl* warnings when the risk of punishment is immediate, but not when it is possible but uncertain."

14

We disagree. A punishment that is "possible but *uncertain*"[10] (italics added), does not constitute a " '*definite* penal consequence[ ]," as that phrase has been used in California cases applying *Boykin-Tahl*. (*Cross*, *supra*, 61 Cal.4th at p. 171, italics added.) While an admission of a prior conviction that exposes a defendant to additional potential punishment in *that* case is "sufficiently like a plea of guilty to require the same procedural protections" (*People v. Howard* (1992) 1 Cal.4th 1132, 1177, citing *Yurko*, *supra*, 10 Cal.3d at p. 863), the same cannot be said of the admission of a serious felony allegation that has *no* immediate penal consequence and as to which any future consequences would be incurred only upon a conviction for an offense committed in the future—an event that may or may not occur.

In *Yurko*, the court reasoned that the prospect of additional severe punishment in the case in which the admission of the prior conviction is made warranted mandating *Boykin-Tahl* requirements. (See *Yurko*, *supra*, 10 Cal.3d at p. 863 ["Because of the significant rights at stake in obtaining an admission of the truth of allegations of prior convictions, which rights are often of the same magnitude as in the case of a plea of guilty, courts must exercise a comparable solicitude in extracting an admission of the truth of alleged prior convictions"].) The *Yurko* court explained:

> "Undoubtedly the particular rights waived by an admission of the truth of the allegation of prior convictions are important. Although there is not at stake a question of guilt of a substantive crime, the practical aspects of a finding of prior convictions may well impose upon a defendant additional penalties and sanctions which may be even more severe than those imposed upon a finding of guilt without

---

10      We quote here from Button's reply brief.

15

the defendant having suffered the prior convictions.  Thus a finding of prior convictions may foreclose the possibility of probation [citation], may extend the term for the basic crime to life imprisonment [citation], and may substantially extend the time served on such a life sentence before the defendant becomes eligible for parole." (*Id.* at p. 862.)

In contrast, in this case, Button was not exposed to any additional penalties or sanctions as a result of the stipulation.  While Button cites the *Cross* court's statement that "our cases suggest that the phrase 'definite penal consequences' means definite *exposure* to additional punishment" (*Cross*, *supra*, 61 Cal.4th at p. 175), it is clear that the *Cross* court was talking about *definite* exposure *in the case in which the allegation is admitted*, and not *potential* exposure in a hypothetical future case.  This is made clear by the fact the very next sentence of the *Cross* opinion explained that the defendant's admission of the prior conviction exposed the defendant to additional punishment *in that case*.  (See *ibid.* ["Because the stipulation here established every fact necessary to expose Cross to a penalty beyond the four-year maximum term available . . . , it resulted in a definite penal consequence"].)

The Supreme Court has also made clear that *Yurko* does not apply where the "admission of the priors . . . [does] not . . . subject [the] defendant to an increased penalty." (*People v. Ramirez* (1990) 50 Cal.3d 1158, 1184 (*Ramirez*).)  In *Ramirez*, a death penalty case, defense counsel stated, at the outset of the penalty phase, that the defendant would stipulate to having suffered three prior convictions.  (*Id.* at p. 1183.)  On appeal, the defendant claimed that "his stipulation to the priors was improper under [*Yurko*, *supra*,] 10 Cal.3d 857, because . . . defendant did not expressly waive his

16

privilege against self-incrimination or his right to a jury or court trial on the prior convictions." (*Ibid.*)  The Attorney General argued that "*Yurko* is not applicable in this context, because defendant's stipulation to the priors was not analogous to the admission of the truth of a sentence enhancement as in *Yurko*, but was instead comparable to a stipulation to the admission of a subsidiary evidentiary matter." (*Ibid.*)  The *Ramirez* court concluded that "[t]he Attorney General's position is well taken." (*Ibid.*)  The court reasoned:

> "Unlike the defendant's stipulation in [*Yurko*], *supra*, 10 Cal.3d 857, which automatically subjected the defendant to an increased sentence under the California habitual criminal law and thus was somewhat comparable to a guilty plea as to which a waiver of rights is constitutionally required (see *Boykin*[, *supra*,] 395 U.S. [at p.] 242; [*Tahl*, *supra*,] 1 Cal.3d at pp. 132–133), defendant's admission of the priors in this case did not inevitably subject defendant to an increased penalty.  Here, the priors were simply evidence in aggravation that the jury was to consider along with all of the other aggravating and mitigating evidence presented at the penalty phase.  Neither *Yurko* nor any other California decision requires an on-the-record waiver of rights by the defendant when the defendant or defense counsel stipulates to the admission of a subsidiary item of evidence of this nature." (*Id.* at pp. 1183-1184.)

As in *Ramirez*, Button's stipulation did not "automatically subject[ ] the defendant to an increased sentence" (*Ramirez*, *supra*, 50 Cal.3d 1158 at p. 1183), and for this reason, is not akin to a prior conviction stipulation triggering *Yurko*'s requirements. (*Ramirez*, *supra*, at pp. 1183–1184.)

Accordingly, we conclude that the trial court was not required to admonish Button pursuant to *Boykin-Tahl* and its progeny prior to accepting the parties' stipulation that Button personally inflicted great bodily injury on B.D.

17

IV.

DISPOSITION

The judgment is affirmed.

AARON, J.

WE CONCUR:

HUFFMAN, Acting P. J.

NARES, J.